**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YABLA, INC.,<br>600 Palisade Avenue, Suite 203<br>Union City, NJ 07087,<br>on behalf of itself and others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>VISA, INC.,<br>One Market Plaza<br>San Francisco, CA 94105,<br><br>        Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   PARTIES ......................................................................................................... 13

III.  JURISDICTION AND VENUE ........................................................................ 14

IV.   FACTUAL ALLEGATIONS ........................................................................... 15

    A.   Overview of the Domestic Debit Industry ............................................... 15

        1.   Debit Transactions ...................................................................... 15

        2.   Debit Networks ........................................................................... 18

    B.   Visa Has Become Dominant in the Domestic Debit Network Industry. ................... 21

        1.   Visa has Solidified Control of the Domestic General-Purpose Debit Network Markets Despite Passage of Legislation Aimed to Increase Competition ................................................................................ 21

        2.   PIN Networks Have Been Unable to Meaningfully Compete for Debit Transactions Despite Continued Innovation and Competitive Prices. .......................................................................................... 24

        3.   Fintech Companies Have Been Unable to Meaningfully Compete for Debit Transactions Despite Superior Products and Lower Prices. ................ 26

    C.   Visa Has Employed a Campaign of Exclusionary Conduct to Obtain and Maintain Dominance in the Domestic Debit Network Industry. ................... 27

        1.   Visa Prevents Meaningful Competition from PIN Networks. ....................... 31

            a.   Visa Imposes Exclusionary Contract Terms on Merchants and Acquirers ....................................................................... 32

            b.   Visa Imposes Exclusionary Contract Terms on Issuers. ................... 37

        2.   Visa Strengthens its Control After Passage of the 2012 Durbin Amendment ................................................................................. 39

        3.   Visa Uses its Dominance to Prevent Competitors from Obtaining Significant Market Share ............................................................. 40

    D.   Visa Prevents Meaningful Competition from Fintech Companies. ........................ 43

        1.   Visa Prevents Real Competition from Staged Wallets ..................... 48

            a.   Visa's Anticompetitive Actions Against PayPal in 2016 Forced it to Stand Down ................................................................. 49

            b.   Visa's Anticompetitive Actions Against Square Between 2014 and 2023 Forced It to Stand Down. ........................................ 51

        2.   Visa Prevents Real Competition from Pass-Through Wallets. ....................... 53

            a.   Visa's Anticompetitive Actions Have Sidelined Big Tech Firms. ........... 53

            b.   Visa's Anticompetitive Actions Against Apple in 2022 and 2023 Have Caused It to Refrain from Competing. ..................... 54

|  |  | 3. | Visa Prevents Real Competition from Next-Generation Innovators like Plaid. ........................................................................ 55 |
| V. | ANTICOMPETITIVE EFFECTS ........................................................................ 61 |
| VI. | LACK OF PROCOMPETITIVE BENEFITS ........................................................ 63 |
| VII. | RELEVANT ANTITRUST MARKETS ................................................................ 64 |
|  | A. | The Relevant Geographic Market is the United States. ................................... 64 |
|  | B. | The Relevant Product Markets are General-Purpose Debit Network Services and General-Purpose Card-Not-Present Debit Network Services. ............................ 65 |
|  |  | 1. | General-Purpose Debit Network Services is a Relevant Product Market. ........................................................................................ 65 |
|  |  | 2. | General-Purpose Card-Not-Present Debit Network Services is a Relevant Product Market. ........................................................................ 68 |
| VIII. | VISA POSSESSES MONOPOLY POWER IN THE DOMESTIC GENERAL-PURPOSE DEBIT NETWORK MARKETS ................................... 68 |
| IX. | CONTINUING VIOLATION .............................................................................. 72 |
| X. | CLASS ACTION ALLEGATIONS ....................................................................... 72 |
| XI. | CAUSES OF ACTION ....................................................................................... 75 |
|  | COUNT ONE .................................................................................................... 75 |
|  | COUNT TWO ................................................................................................... 76 |
|  | COUNT THREE ................................................................................................ 77 |
|  | COUNT FOUR .................................................................................................. 78 |
| XII. | REQUEST FOR RELIEF ................................................................................... 79 |
| XIII. | JURY TRIAL DEMAND ..................................................................................... 80 |

Plaintiff Yabla, Inc. ("Plaintiff") brings this action individually and on behalf of a Class (defined below) of all others similarly situated against Defendant and alleges the following.

## I.    INTRODUCTION

1.    Visa has monopolized the United States general-purpose debit network markets (defined below) by preventing the emergence of meaningful competition from multiple types of companies and charging Plaintiff and the other Class members artificially inflated prices for its debit products during the class period (defined below).

2.    Visa has engaged in a systemic, multi-pronged campaign of exclusionary conduct—deployed at each pressure point where its dominance might be threatened—that has continued to this day. Under its campaign, Visa has prevented actual and potential competitors, including well-known and well-resourced companies, from building or expanding innovative, cost-effective products and networks that would have increased competition in the relevant markets while decreasing Visa's control over those markets, as Visa itself has recognized. Under this campaign, Visa also has punished and threatened to punish businesses that have tried to use cheaper and superior alternative methods or networks to process debit transactions. This anticompetitive conduct has artificially inflated the prices of debit network transaction fees that Plaintiff and the Class have been forced to pay during the class period.

3.    While Visa's anticompetitive conduct has harmed Plaintiff and the many other Class members who must process numerous debit transactions on a daily business to run their businesses, this conduct has helped Visa protect its massively profitable debit business by enabling it to control the network that connects consumers' and merchants' banks to facilitate debit transactions. Indeed, more than 60% of debit transactions flow through Visa's debit network annually, generating more than $7 billion in fees at operating margins of 83%. The revenue from its debit business exceeds the revenue that Visa earns from its credit business.

4.     Visa's debit business's profitability would diminish substantially if it faced meaningful competition. Such competition would cause Visa to lose sales volume and market share to competitors, lower its fees to Plaintiff and the other Class members, and take other steps that it has avoided doing for some time: compete on the merits.

5.     Acutely aware of the outsized role that the performance of its debit business has played in contributing to its financial success company-wide, Visa has worked to protect the profitability of its debit business at all costs. Visa's campaign has had the purpose and effect of thwarting meaningful competition in the domestic general-purpose debit network markets, and Plaintiff and the other Class members have been left footing the bill.

6.     Overwhelming factual support for Visa's anticompetitive behavior in the relevant markets already exists. Much of that support is set forth in complaints that the United States Department of Justice's Antitrust Division ("DOJ") filed against Visa in November 2020 and September 2024 concerning much of the conduct at issue here. These complaints' factual allegations—informed by pre-filing discovery obtained from Visa and other industry participants—not only shed light on important details underlying Visa's monopolistic conduct, but they also demonstrate what drove Visa to engage in this conduct. *See* Complaint (ECF No. 1), *United States v. Visa, Inc.*, No. 1:24cv7214 (S.D.N.Y. Sept. 24, 2024) ("DOJ Visa Compl."); Complaint (ECF No. 1), *United States v. Visa, Inc. and Plaid, Inc.*, No. 3:20cv7810 (N.D. Cal Nov. 5, 2020) ("DOJ Visa-Plaid Compl.").

7.     Visa's former Chief Financial Officer summarized the core tenet behind its anticompetitive campaign that has allowed it to protect its dominant position in the domestic general-purpose debit network markets:

> ***[E]verybody is a friend and partner. Nobody is a competitor.*** . . .  The only issue is to figure out how to make it worth their while to ***partner*** with us. And so far, we've managed to do that, whether it's with wallets, whether it's with large tech companies, whether it's with large merchants. And as long as we keep doing that and keep our network valuable for everyone ***things should be fine***.

8.      Visa has directed its systemic and sustained campaign of exclusionary conduct at each major type of competitive threat that has emerged to challenge its domestic debit network dominance. First, Visa has prevented meaningful competition from existing PIN network operators by forcing merchants, acquirers and issuers to accept contract terms imposing punitive fees if they process anything more than a de minimis amount of debit transactions using these lower-cost alternatives. Second, Visa has stifled meaningful competition from companies operating in the fintech (financial technology) space, including some of the biggest technology companies on the planet, by inducing them into "partnerships" that net these firms significant amounts of money in exchange for their commitment to cooperate rather than compete with Visa. Third, Visa attempted to acquire one innovative fintech upstart who represented an existential threat to Visa's debit dominance, and when it abandoned that attempt in the face of governmental opposition, it resorted to its "partnership" playbook to sideline that threat.

9.      Because competitors have been unable to obtain the volume and scale to meaningfully compete with Visa in debit, merchants like Plaintiff and the other Class members have had no choice but to accept debit transactions that Visa processes and pay Visa's supracompetitive fees. This dynamic has massively affected American businesses of all shapes and sizes. Businesses accept debit transactions to process customer payments billions of times annually, and those transactions have a collective annual value of over $4 trillion. In recent years, moreover, merchants have accepted an increasing volume of these transactions from consumers. Some of these debit transactions involve debit cards used at physical stores (called card-present, or CP, transactions), while others happen online or over the phone (called card-not-present, or CNP, transactions).

10.     No matter the form, many parties play a role in facilitating debit transactions. For instance, if a consumer uses a debit card to pay a merchant, at least five parties make the transaction happen. The consumer offers to pay with a debit card. The merchant accepts the debit card as

3

payment. Behind the scenes, additional parties are involved, namely the consumer's bank (from where the funds come), the merchant's bank (to where the funds go), and the middleman that connects the two (the debit network). Without the debit network, which allows consumers' and merchants' banks to connect and communicate, the funds from the consumer's bank would never reach the merchant's bank.

11.    Debit networks cannot process a debit transaction unless they can connect the bank that issued the debit card to the consumer (the issuing bank or issuer) and the merchant's bank (the acquiring bank or acquirer). This connection can only happen when the issuer and acquirer are part of the same network. Because issuers decide which networks to place on their debit cards and merchants and acquirers independently decide which networks to accept to process debit transactions, there is no guarantee that an issuer and acquirer will be part of the same network and, therefore, able to connect.

12.    This presents a dilemma for debit networks. To succeed, many issuers must put the debit network on their debit cards and many acquirers must accept it. But issuers generally will not place debit networks on their cards unless many merchants and acquirers already accept the network. Conversely, merchants and acquirers likely will not join a debit network unless their customers already have cards that use it. Put differently, issuers will likely only join a debit network if acquirers already use it, and acquirers will only likely only join a debit network if issuers already use it. This chicken-and-egg problem underlying these network effects makes it exceedingly difficult to achieve scale on both the consumer and issuer side and merchant and acquirer side of the market. Visa understands this reality of the two-sided debit transaction market, and its entrenched position with both issuers and acquirers has allowed it to protect its business and prevent competitors from approaching the scale necessary to compete meaningfully.

13.     Visa has been the nation's largest debit network for some time. Over 60% of debit transactions run through Visa's network, with an even higher 65% of CNP transactions running through it. Mastercard, the second largest network, processes less than 25% of all debit and CNP transactions in the United States. Other debit networks, including PIN networks like STAR, NYCE, and Pulse,[1] have even less market share, making up only around 11% of all debit transactions and about 5% of CNP transactions.

14.     But Visa has not maintained its market dominance through open and honest competition. Rather, Visa has continued to preserve its monopoly power by engaging in conduct designed to insulate itself from genuine competition rather than fighting it out in the marketplace. Visa's conduct in this regard has been particularly aggressive and brazen in response to the increased competition it feared would occur following the 2012 passage of the Durbin Amendment.

15.     As part of 2010's Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress passed the Durbin Amendment to promote competition in the debit industry by giving merchants more debit network options for processing transactions. Pub. L. No. 111-203, 124 Stat. 1376 (2010). The Durbin Amendment required issuing banks to include at least two unaffiliated debit networks on every debit card: at least one on the card's front side (front-of-card networks) and at least one on the card's back side (back-of-card networks).

16.     Visa understood that the Durbin Amendment could erode its market share by causing banks to connect their debit cards to more non-Visa debit networks. This would allow smaller debit networks to gain the scale needed to compete meaningfully with Visa. In 2012, Visa lost some volume to debit networks that charged lower fees, and if that trend had continued, Visa eventually would have

---

[1] These networks are known as PIN networks because they are an outgrowth of ATM networks that required accountholders to input a PIN to withdraw money from their accounts.

lost its dominant position in the debit network market. But Visa did not let that happen, using its market position to limit competition and maintain the status quo.

17.     Visa has used its control over certain debit transactions that merchants and issuers only can process over Visa's debit network, known as non-contestable transactions,[2] to limit competition for contestable transactions from existing PIN Network competitors. Visa has done this by adopting two methods: (1) penalizing merchants with prohibitively high rack rates (list prices) completely untethered from incremental costs if they do not meet extremely high volume-based exclusivity requirements; and (2) paying off acquirers, issuers, and some large merchants on the front end to ensure exclusivity to Visa.

18.     Routing deals give a merchant or its acquirer a discount on Visa transactions if they route a large portion of their debit transactions through Visa. If a merchant or acquirer refuses to accept a routing deal, then Visa charges them a punitively high rack rate (another term for list price) for each Visa debit transaction—including the non-contestable transactions that must go through Visa. In reality, Visa threatens merchants and acquirers with economically coercive rack rates unless they forego routing a meaningful portion of their debit transactions to Visa's competitors. As a result, these merchants and acquirers have only one real option, and that is to accept the routing deal and process a significant majority of their debit transactions through Visa's debit network. This is no choice at all, and it prevents other debit networks from competing for those transactions and growing their market shares.

19.     Visa engineered coercive routing arrangements with over 180 of it largest merchants and acquirers in 2014—and renewed many of them in 2022—to help entrench its market dominance. This conduct has allowed Visa "***to stabilize [its] volume***" by ensuring that the lion's share of

---

[2]  At least in theory, merchants can choose between Visa and other networks for contestable transactions, which can foster competition and bring about lower fees and product innovation.

transactions run through its debit network. These arrangements have insulated at least 75% of its debit volume and foreclosed about 45% of all domestic debit volume from competition—a share of the market that is more than enough to trigger antitrust liability.

20.     Mastercard, Visa's only longstanding debit network rival that has a 25% market share, has been unable to gain market share or meaningfully restrain Visa's monopoly. This is due in large part to the anticompetitive deals that Visa has struck with many of the country's largest financial institutions that severely restrict their ability to issue competing debit cards issued by Mastercard or any other debit network rivals, like American Express and Discover.

21.     For example, in 2023, JPMorgan Chase, which issued Visa-branded debit cards with Mastercard's Maestro back-of-card, requested relief from a Visa contractual term preventing the addition of a second back-of-card debit network. JPMorgan Chase wanted to add Discover's Pulse to comply with a newer regulation interpreting the Durbin Amendment and because Pulse offered both CP and CNP PINless functionality. Visa feared that adding Pulse could create the tipping point for merchants and acquirers that might cause a sizable amount of merchant volume being enabled for PINless transactions. In turn, Visa worried that PINless networks would price a significant amount of CNP transactions lower than Visa and that this would cause even more merchants to adopt PINless networks and Visa to lower its prices to prevent further loss of customers and market share. To assuage its concerns, Visa gave JPMorgan Chase only a short-term waiver to temporarily add Pulse while demanding the bank sign a new debit-routing contract that would further protect it from competition.

22.     Visa also has stifled competition in the debit network market from innovative fintech companies. Visa knows that innovations by these companies could result in consumers making debit purchases in new ways, thus eroding its control over debit transactions. Many digital platforms, such as Apple, PayPal, and Square, already have large networks connecting consumers and merchants that

offer products allowing consumers to conveniently and efficiently pay merchants by linking their debit card credentials to Apple Pay, PayPal, Cash App, and other payment products.

23.     Rather than compete against these companies on the merits, Visa has utilized a carrot-and-stick approach. Under this approach, Visa has bought their commitments to refrain from competing with large upfront payments totaling in the hundreds of millions of dollars. At the same time, Visa threatened levying high fees on these companies for transactions where those companies had no real choice but to use Visa's debit network as well as the claw-back of substantial up-front payments that Visa had made as monopoly insurance.

24.     Visa has had good reason to worry about these fintech companies. Many of them have the necessary technology, resources, and brand names to to disintermediate Visa as a link between consumers and merchants and issuers and acquirers. Visa thus view these companies and their innovative products, like Apple Pay, as a major threat to its debit business. Alternative payment rails that facilitate real-time money transfers have become increasingly available, and a growing number of fintech companies could build on these rails to meaningfully compete with Visa in a fair and open market. By enabling direct, real-time mobile money transfers over alternative payment rails, these companies pose a serious threat to Visa's highly profitable dominance of CNP transactions. Indeed, Visa itself has recognized that real-time fintech money transfers would "become a ***viable merchant option***" that was "***positioned and priced as a 'Substitute for Debit'***" unless Visa acted to prevent this from occurring.

25.     PayPal has been the only major entity that has ever successfully disintermediated Visa, diverting business away from Visa through lower-cost payment methods that moved money through ACH. But this 2016 disintermediation would prove to be short-lived. Visa responded by publicly threatening to target PayPal "***in ways people have never seen before***." Visa ultimately forced PayPal into an arrangement that required PayPal to stop competing with Visa' debit network by ceasing the

promotion of alternative payment methods and by actively promoting Visa's debit network. Visa again took a page out of its standard "partnership" playbook—flaunting big payouts as a carrot, wielding punitive fees as a stick—to bring PayPal's debit transaction volume back onto its dominant debit network. As Visa's Senior Vice President and Head of Product for North America explained, PayPal has been less of a threat to Visa's online debit business in recent years because "***Visa and PayPal have figured out a way to be partners, as opposed to, sort of, direct competitors***" and have found "ways to ***work together, as opposed to not work together***."

26.    Visa also used its market power to undermine PayPal's efforts to partner with brick-and-mortar merchants and bring its business model in-store by restricting ACH transactions for all customers who had Visa-branded cards in their PayPal wallets. Although Visa loosened these restrictions in 2021, it still demanded information from PayPal that it has used to monitor PayPal's product performance. In addition, Visa's restrictions have resulted in consumers only being able to use PayPal's in-store ACH option if they first scan a merchant's QR code and then connect to PayPal to approve the transaction. Not surprisingly, this inefficient multi-step procedure has limited PayPal's use as an in-store alternative to a Visa debit card.

27.    Visa's continuing exclusionary actions and threats have given PayPal little choice but to keep ceding to Visa's demands. In 2022, PayPal and Visa signed a 10-year contract requiring PayPal to route 100% of its Visa-eligible volume from years four to ten of the contract. The contract also provides for significant penalties to PayPal upon failure to convert its co-branded debit cards to Visa, the preservation of Visa's "customer choice" provisions favoring Visa payments, and requirements that PayPal participate in specified Visa programs and services.

28.    Visa similarly has coerced Square into signing anticompetitive agreements that have prevented its innovative Cash App, Cash Drawer, and Cash App Pay products from taking appreciable

market share away from Visa with these peer-to-peer digital payment options while simultaneously benefitting Visa's bottom line.

29.     Square wanted to facilitate debit payments between users while avoiding additional Visa fees, so it first developed Square Cash (now known as Cash App) to facilitate peer-to-peer payment. Visa feared that this sort of peer-to-peer ACH routing option not only would threaten its debit payment volume, but that if Square were to acquire a critical mass of bank account credentials from peer-to-peer transactions, it could use that information to launch a consumer-to-merchant debit competitor that would threaten Visa's debit business in a more fundamental way. In 2014, Visa leveraged its dominant position to foist the first of numerous contracts on Square providing that it would agree to forego charging Square punitively high rates for debit transactions using Visa's network so long as Square agreed not to compete with Visa in the manner contemplated above.

30.     Square's 2016 announcement of the release of a new product called Cash Drawer, however, rekindled Visa's fears about disintermediation and the decline of its debit network market dominance. Like PayPal and its peer-to-peer platform, Venmo, Cash Drawer permitted users to store funds in their Square Cash account. In response, Visa threatened Square with termination of the 2014 contract, telling Square that Cash Drawer was antithetical to the model the two had developed. Instead of facing the possibility of significantly higher fees and penalties on Visa debit transactions, Square promptly removed the feature, again capitulating to Visa's anticompetitive demands.

31.     This pattern repeated itself several years later. In 2021, Square launched Cash App Pay, which would enable customers to make purchases directly from merchants. Because Cash App Pay would have triggered Visa's onerous fee clause, Square asked Visa to waive the fees. Visa feared the threat of disintermediation that Cash App Pay posed, Visa also recognized that it could use the threat of onerous fees as leverage in negotiations with Square. These negotiations culminated in 2023 with another exclusionary deal that required Square to send 97% of Cash App Pay transactions over Visa's

rails, to give preference to Visa during the Cash App Pay customer sign-up process, and to not steer customers to any peer-to-peer ACH routing option.

32.     Visa also has thwarted significant competition from Big Tech companies who also are its customers by threatening them with prohibitively high fees to extract concessions from them that entrench its market dominance while paying them to forego pursuing or promoting alternative debit products that could result in disintermediation or otherwise adversely impact Visa's market position.

33.     One such company is Apple. Visa has responded to the competitive threat posed by this firm just as it has done with numerous others. In 2022, Visa feared that its relationship with Apple had reached a "***tipping point***" because the forays Apple had made in the traditional debit market represented an "***existential threat***" that could well reduce Visa's debit dominance. So Visa resorted to its standard playbook and "partnered" with Apple. Under the terms of a 2023 agreement, Visa agreed to pay Apple hundreds of millions of dollars and reduce the fees Apple paid to it for debit transactions run on Visa's network in exchange for Apple's promise not to create or launch any payment product or alternative payment technology aimed at competing with or disintermediating Visa, to provide incentives intended to disintermediate Visa or encourage customers not to use Visa cards, and to not promote alternative payment methods, like ACH, to customers.

34.     Finally, Visa has prevented competition from innovative companies by attempting to swallow completely at least one such company. That company, Plaid, represented an existential threat to Visa's domestic debit dominance and motivated its attempt to acquire it.

35.     With its innovative "pay-by-bank" debit transaction-facilitating service that Plaid planned to introduce to the marketplace, Plaid's goal was to "***steal[] share***" and become a "***formidable competitor to Visa***" in the online segment of the domestic debit network markets. Visa grew so concerned about the competitive threat that Plaid and its next-generation technology, which Visa first discovered in 2019, posed to its debit business that it decided that that the best course of action for

its bottom line was to eliminate Plaid as a competitive threat, even at an amount its leadership conceded "does not hunt on financial grounds."

36.     Visa's executives confirmed in internal company documents the anticompetitive reasons motivating its planned acquisition of Plaid. For example:

- One Visa executive noted that the planned acquisition was "***defensive***" in that it would prevent the financial loss Visa would incur as "the result of ***Plaid landing in the wrong hands***."

- Estimating a "potential downside risk of $300-500M in our US debit business" by 2024 if Plaid was acquired by a competitor, Visa's leadership remarked that such an event could create an "***[e]xistential risk to our U.S. debit business***" and that "***Visa may be forced to accept lower margins or not have a competitive offering***" as a result.

- Another Visa executive relayed his concerns to colleagues about the grave threat Plaid posed to Visa's debit business by proclaiming that "***I don't want to be IBM to their Microsoft***," while analogizing Plaid to an island "volcano" and warning that "[w]hat lies beneath" was "a massive opportunity – ***one that threatens Visa***."

- Concluding that Plaid was "***clearly***, on their own or owned by a competitor ***going to create some threat to our important US debit business***," Visa's CEO told its CFO that buying Plaid would be "***an insurance policy to protect our debit biz in the US***."

37.     The DOJ sued to block the proposed acquisition after learning about these and other statements in pre-filing discovery in November 2020. Undeterred by the governmental opposition that ultimately forced it to drop the planned acquisition, Visa resorted to its standard "partnership" playbook to sideline Plaid as an emerging threat. In an early 2021 press release, Visa's Chairman and CEO proclaimed that his company "look[ed] forward to ***our continued partnership***" with Plaid. Plaid's CEO and Co-Founder added that "[w]hile Plaid and Visa would have been a great combination, we have decided to instead ***work with Visa as an investor and partner*** so we can fully focus on building the infrastructure to support fintech."

38.     Visa's anticompetitive conduct has substantially harmed competition in the domestic general-purpose debit network markets. Visa has accomplished this by blocking competitors, stifling innovation, and keeping prices at artificially high levels. American merchants and consumers, and the

broader American economy, have paid the price. As Attorney General Merrick Garland stated in announcing the DOJ's new lawsuit against Visa, "Visa's unlawful conduct affects not just the price of one thing—but the price of nearly everything."

39.    Plaintiff and the Class bring this action to end Visa's anticompetitive practices and recover all damages and obtain all other relief necessary and proper under federal antitrust law.

## II.    PARTIES

40.    **Plaintiff.** Plaintiff Yabla, Inc. ("Plaintiff") is a New York corporation with its principal place of business in Union City, New Jersey.

41.    Plaintiff offers immersive computer-assisted language learning courses featuring interactive videos of various difficulty levels and formats. Plaintiff licenses authentic content and produces original videos, with a library of thousands of videos in Spanish, French, German, Italian, Chinese, and English featuring native speakers. Plaintiff also offers vocabulary and grammar lessons, personalized flashcard decks, and iOS and Android apps for mobile learning. Plaintiff's subscription clients have included individuals, high schools, colleges like the University of Michigan and the United States Military Academy, and governmental organizations including the United States Department of State.

42.    Plaintiff accepts general-purpose debit cards that run on Visa's debit network. Within the past four years, Plaintiff has processed hundreds of thousands of dollars in debit card transactions on Visa's debit network. This amount exceeds the combined monetary value of debit card transactions run on the few other, smaller debit networks that Plaintiff processed during that period by a factor of three.

43.    **Defendant.** Defendant Visa, Inc. ("Visa" or "Defendant") is a Delaware company with its principal place of business in San Francisco, California.

44.    Visa owns and operates the largest debit network in the United States. Last year, the Visa debit network—a two-sided transaction network that processes and facilitates debit transactions between businesses, consumers, and banks through authorization, clearance, and settlement—processed 57.6 billion transactions worth $2.8 trillion. In the 2023 fiscal year, Visa reported $32.7 billion in revenue, including $14 billion in the United States alone.

45.    Visa engages in and substantially affects interstate trade and commerce through its business activities, including operation of its debit network. Visa markets, distributes, and offers its services, including its debit network services, throughout the United States, across state lines, and in this District.

## III.    JURISDICTION AND VENUE

46.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

47.    This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interests and costs; and (3) Visa and at least one Class member are domiciled in different states.

48.    This Court has personal jurisdiction over Visa under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and New York's long-arm statute, N.Y. C.P.L.R. § 302.

49.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because Visa maintains business facilities, has agents, regularly transacts business, and is otherwise found within this District and a substantial portion of the unlawful acts alleged herein were performed and had effects, including on interstate commerce, within this District.

IV.    **FACTUAL ALLEGATIONS**

A.    <u>**Overview of the Domestic Debit Industry**</u>

1.    **Debit Transactions**

50.    In the United States, most consumer-facing merchants accept and process debit transactions—financial transactions in which funds are withdrawn from a consumer's bank account and deposited into a merchant's bank account to pay for goods or services—as a method for consumers to buy goods and services using a number directly linked to their bank account.

51.    The most common way consumers make, and merchants accept, debit purchases in the U.S. is with a general-purpose debit card issued by the consumers' bank. Here, general-purpose means that many unrelated merchants will accept the debit card. Consumers can use these cards at brick-and-mortar retailers and online to buy goods and services with funds in their bank account.

52.    Debit cards first emerged in the 1960s as a way for customers to withdraw funds from their bank account at an ATM. Eventually, consumers could use debit cards to pay for goods and services at retail stores. By the 1990s, an increasing number of consumers used debit cards as a payment method because of their convenience, security, and growing acceptance among merchants as a payment method. As the number of consumers using debit cards grew, so did the number of merchants accepting them as payment. Today, tens of millions of Americans use debit cards, and merchants accept them as payment for both online and in-store purchases. Even though debit cards do not offer rewards like credit cards, consumers often prefer debit cards because they do not want to use or cannot obtain credit cards.

53.    Debit networks process debit transactions and provide the infrastructure facilitating secure, real-time payments between businesses', merchants', and consumers' bank accounts.

54.    Visa and other debit networks do not issue general-purpose debit cards directly to consumers. Instead, they agree with the consumers' bank (the issuing bank or issuer[3]) to create and issue debit cards and then contract with the merchants' bank (the acquiring bank or acquirer[4]) so that merchants can and will accept the debit cards.

55.    Thousands of issuers connect with acquirers and merchants through the debit networks that those acquirers and merchants use.

56.    Debit networks operate by creating a debit credential or other unique identifier for each consumer. As shown in the figure below, debit card credentials include a 16-digit debit card number, security features (e.g., an expiration date, the card verification value (CVV), an EMV security chip, a four-digit PIN), a graphic on the front of the card identifying the "front-of-card" network, and, sometimes, a graphic on the back of the card identifying the "back-of-card"-network(s):



---

[3] The issuing bank may work with an issuer to connect with the debit network. The processor may also provide services, like managing card issuance, authorizing or declining transactions, and communicating with settlement entities. Here, issuer means both banks and issuer processors.

[4] As with issuing banks, acquiring banks may also work with acquiring processors to send transaction data to the network. Here, acquirer means both acquiring banks and acquirer processors.

57.     Debit cards infrequently include more than one front-of-card and one unaffiliated back-of-card network. All merchants that participate in a debit network by using an acquiring bank connected to the network can accept a consumer's debit credential or unique identifier to initiate payment.

58.     Debit networks also provide the "rail"—how acquirers and issuers communicate with each other to facilitate transactions and transfer funds. Debit networks provide other services too, such as guaranteeing payment for merchants, allowing consumers to dispute and chargeback transactions, and providing fraud protection for all parties.

59.     Debit networks facilitate the movement of money from a consumer's bank to a merchant's bank by clearing and overseeing interbank settlements. On a daily basis, debit networks aggregate all transactions for each bank in their systems, net out applicable fees, and provide settlement reports to the banks, which they use to transfer funds between themselves to cover that day's transactions.

60.     Debit networks write the rules for transactions they process. As the largest debit network in the United States, Visa uses its intermediary role and market dominance not only to set the rules for transactions on its network, but also to influence other networks' rules.

61.     An example illustrates how this process works in practice. To start, a consumer presents his debit credentials to a merchant, which causes the merchant to initiate a request from its acquirer. Upon receiving the request, the acquiring bank sends the consumer's account and transaction information to a debit network—like Visa—to process the transaction for authorization, clearing, and settlement. When the debit network receives the consumer's account and transaction information, it seeks authorization from the issuer to approve the transaction. If the consumer has enough money in their account and there is no indication of fraud, the issuer will authorize the transaction. The issuer then puts a hold on the consumer's funds and transmits authorization to the debit network, which

sends authorization to the acquirer. The debit network only authorizes payment of the requested funds minus the interchange fee, which it imposes on the merchants and the issuer deducts from the amount owed to the merchant. Finally, the acquirer transmits the authorization response to the merchant, who can then complete the transaction.[5]

62.     The following figure illustrates the debit transaction process discussed above:



63.     Debit transactions take seconds, allowing debit cards to quickly facilitate transactions between consumers and merchants. For each such transaction that utilizes Visa's debit network, Visa collects several different fees that apply to billions of debit transactions annually.

64.     Theoretically, in the above example, merchants could choose whether to use the front-of-card or back-of-card network. Practically, this choice is illusory. Due to Visa's exclusionary and anticompetitive conduct, the merchant will route through Visa by default whenever Visa is the front-of-card network.

### 2.  Debit Networks

65.     Debit cards must have a front-of-card network and at least one back-of-card network with no affiliation to the front-of-card network. Issuers choose these networks for any given debit card, which means that, practically speaking, issuers determine the debit network that consumers and merchants will use for transactions with that debit card.

---

[5] While in-person CP transactions have slightly different mechanics than CNP transactions (like using debit credentials on a website, in an app, or over the phone), the process described above for executing transactions across many banks and a debit network applies to both in-person and online debit transactions. CNP debit transactions continue to grow in volume and now constitute about half of all debit spending, a significant increase since 2010.

66.     The front-of-card network usually has its logo displayed on the card's front, whereas the back-of-card network may not have its logo displayed on the card's back.[6] Back-of-card networks included on a debit card cannot necessarily be used for every transaction involving the card because the issuer may choose not to enable the back-of-card network for certain transaction types, like CP transactions where no PIN was entered.

67.     Visa is the largest front-of-card network for debit cards in the United States. Mastercard is the second largest but has a considerably smaller market share. All other competitors have much smaller market shares.

68.     Due to high switching costs, including the cost of issuing new debit cards to account holders, issuers rarely change front-of-card networks. Moreover, Visa has long-term agreements with many issuers to remain as each issuer's front-of-card network. These facts help assure Visa that Mastercard and other debit networks will not overtake it as the front-of-card network for banks that use Visa.

69.     Debit networks make money by imposing network fees—which issuers deduct from what it pays to the merchant—for every debit transaction processed on their network. Visa imposes two types of debit network fees on merchants: (1) per-transaction fees; and (2) fixed fees.

70.     For the per-transaction fee, Visa charges a network fee for every transaction processed on the network. The amount of this fee depends on the transaction type and attribute, including whether it is card-present or card-no-present and whether the accountholder enters a PIN. For most transactions, Visa levies network fees far greater than their PIN network competitors.

---

[6] To comply with the Durbin Amendment, these cards also include an additional unaffiliated back-of-card network, like Mastercard's Maestro, STAR, NYCE, Accel, Culiance, AFFN, Jeanie, Shazam, or Pulse. Debit cards with Mastercard as the front-of-card network generally include Maestro as one of the back-of-card networks in addition to an additional unaffiliated back-of-card network.

71.    Visa began charging a fixed monthly fee, called the Fixed Acquirer Network Fee (FANF), in 2012. The amount of this fee depends on factors like the number of locations the merchant operates and the merchant's volume of CNP transactions.

72.    Issuers also deduct another per-transaction fee imposed by the debit network, called an interchange fee, from the funds it sends to the merchant. For issuers with $10 billion or more in assets, the Federal Reserve caps the interchange fee. The debit network sets the fee for smaller issuers.

73.    Merchants pay the Visa debit network fees by having them deducted from the funds they receive for a transaction. Merchants also must pay the acquirer a fee for its services.

74.    A typical Visa debit card transaction is for $60 and costs the merchant around 44 cents in merchant fees. These fees are paid to the merchant's bank. While part of this amount is kept by the acquirer, the majority—around 24 cents—is passed on to the card issuer, such as Chase, Bank of America, or Capital One, through interchange fees that Visa also sets. Visa then collects network fees of about 14 cents per transaction from the issuers and acquirers, although four cents are typically returned to these parties in the form of volume discounts.

75.    The following graphic illustrates the payment flow in a Visa debit card transaction:



76.     While individually incremental, the fees that merchants collectively pay to use the Visa debit network represent billions of dollars.

**B.  Visa Has Become Dominant in the Domestic Debit Network Industry.**

**1.  Visa has Solidified Control of the Domestic General-Purpose Debit Network Markets Despite Passage of Legislation Aimed to Increase Competition.**

77.     The United States' first debit networks began as ATM networks. Banks gave customers ATM cards so they could easily withdraw money from their accounts by entering a PIN at an ATM instead of providing a signature at a bank counter.

78.     Merchants benefitted from this innovation. Instead of needing to rely on checks, they could and did install PIN pads at their stores so customers could use ATM cards at the point of sale.

79.     Customers also adapted to the innovation, growing accustomed to carrying debit cards to make purchases. As more customers used debit cards, more merchants installed PIN pads. As this became more common, the networks that enabled ATM withdrawals, like STAR, NYCE, and Pulse, transformed into the PIN networks.

80.     When debit cards came onto the scene, Visa and Mastercard operated as joint ventures owned and exclusively controlled by their member banks, which were effectively all United States banks, and dominated in credit card infrastructure. They used these relationships with member banks and existing credit card infrastructure to quickly build and scale front-of-card debit products.

81.     In the 1990s, the Visa Check Card, Visa's point-of-sale debit product, debuted. Visa quickly scaled this new product, as each of its member banks issued debit cards with Visa's logo. Visa processed debit purchases over its existing credit card rails, as opposed to the rails designed for ATM networks that PIN networks used. In addition, Visa (and Mastercard) had preexisting access to merchants that accepted their credit cards, which allowed them to issue widely accepted debit cards. And to help with this rollout, Visa initially enforced network rules that required merchants to accept

both its credit and debit cards. Visa quickly scaled its debit offerings as it worked with issuers to add its credit processing infrastructure to the issuers' base of ATM cards.

82.    Until the early 2000's, Visa and Mastercard enacted and enforced exclusionary rules that prevented member banks from issuing cards offered by other network competitors. These two companies' practices had the purpose and effect of foreclosing these competitors from the business of issuing cards through banks, stifling their ability to grow their networks, and preventing these competitors from meaningfully competing with them for network services.

83.    This anticompetitive conduct came to an end in late 2003, when the United States Court of Appeals for the Second Circuit affirmed a Southern District of New York order which held that it constituted illegal tying in violation of Section 1 of the Sherman Antitrust Act. *See United States v. Visa U.S.A.*, 344 F.3d 229 (2d Cir. 2003).

84.    Visa and Mastercard subsequently settled private litigation regarding similar conduct soon thereafter. As part of that settlement, the two companies agreed to allow merchants to accept their debit cards without also accepting their credit cards, and vice versa. *See In re Visa Check/MasterMoney Antitrust Litig.*, 2003 WL 1712568 (E.D.N.Y. 2003).

85.    By 2003, however, Visa already was the largest player in the domestic debit network. Mastercard and Visa went public in 2006 and 2008, respectively, with their former member bank issuers buying significant stock in each. Even though the injunction and settlement entered in the above-referenced litigations did not prevent these members from issuing Visa- and non-Visa-branded debit cards, most chose to issue only Visa-branded or Masterbrand-branded cards. Consequently, these companies fought for front-of-card placement. At the same time, each company had little practical ability to displace the other one as an issuer's front-of-card network because issuing new cards to all accountholders would be a prohibitively difficult and costly endeavor. Companies other than Visa and Mastercard, moreover, rarely achieved front-of-card status because they did not have

the same scale of merchant relationships needed to help build and maintain more competitive networks.

86.     Between that time and when the Durbin Amendment became law, banks often featured only one network, the front-of- card network, on their debit cards. Those networks were almost always Visa and Mastercard, and predominantly Visa. Thus, merchants had to use whichever of Visa or Mastercard was on a given card for routing transactions related to that card.

87.     Congress enacted and the President signed the Durbin Amendment in 2012. The new law was changed the prevailing dynamic by requiring issuers to issue debit cards enabled with a back-of-card network unaffiliated with the front-of-card network that could compete with the front-of-card network for transactions with the goal of increasing merchants' options for routing debit transactions.

88.     The Durbin Amendment also limited the interchange fees merchants paid for every debit transaction run on cards issued by issuers with more than $10 billion in assets. And that rule contained a no-evasion provision that limited networks' ability to provide incentives to issuers by paying them in excess of the cap. Paradoxically, this no-evasion provision entrenched, rather than displaced, Visa's front-of-card dominance because it made it more difficult for Mastercard and other networks to earn front-of-card placement by barring them from fully compensating issuers for their switching costs.

89.     Despite the Durbin Amendment's enactment, however, Visa has remained the United States' dominant front-of-card debit card network by a large margin. The Mastercard network, which remains Visa's largest (albeit much smaller) debit network competitor in the United States, has been unable to cut into Visa's market share or restrain Visa's monopoly. Whereas Visa is the front-of-card brand for over 70% of debit card payment volume in the United States, Mastercard has less than 25% of this volume, and American Express and Discover each have significantly smaller shares.

### 2. PIN Networks Have Been Unable to Meaningfully Compete for Debit Transactions Despite Continued Innovation and Competitive Prices.

90.    Debit networks can only win transactions if the issuer puts the network on the debit card used for the transaction. While necessary, that condition is not sufficient to guarantee that a network will win a transaction. Even if a network makes it onto a card, it still may be unable to win some transactions because the issuer, acquirer, or merchant has not enabled the network to process the type of transaction at issue.

91.    To effectively compete for all transactions, a debit network must achieve sufficient scale on the issuer and merchant sides of the debit market. It also must enjoy broad acceptance and be enabled by all network participants—accountholders, issuers, acquirers, and merchants—because this creates a feedback loop called network effects.

92.    Networks effects work as follows. If more issuers place a network on a card, more accountholders will present the network for payment, and more merchants and acquirers will accept the network. On the other hand, if issuers do not place a network on a card, accountholders will not present the network for payment, and merchants and acquirers will have far less reason to accept the network.

93.    Visa greatly benefits from network effects. It is the dominant front-of-card debit network, and it is the default routing option every time it is front-of-card. On the flip side, the market dynamics make it difficult for PIN networks and other potential competitors to build scale on both sides of the market.

94.    But PIN networks have continued to innovate, including by developing the ability to process PINless debit transactions, i.e., debit transactions where customers do not need to enter a PIN. This PINless technology let PIN networks process CNP technologies, like online purchases or in-person transactions that do not involve a customer entering PIN.

95.     But these innovations only go so far. Visa's dominance and exclusionary rules, coupled with PIN networks' collectively small size, make it so that PIN networks can only complete for a small portion of debit transactions.

96.     To entrench its monopoly position, Visa's coercive contracts with merchants and acquirers include terms that force the merchants or the merchants that use the acquirers to route a vast majority of their debit transactions to Visa instead of back-of-card networks like PIN networks and Maestro. These contractual provisions block competition for a large portion of debit transaction volume, thus depriving Visa's actual and potential rivals of critical scale and artificially limiting routing options.

97.     Visa can impose these contractual provisions in part because certain non-contestable transactions must always be routed to Visa due to prohibitions on back-of-card networks processing certain transactions, like those over a certain dollar amount or those that fail to meet certain encryption criteria.

98.     CP transactions can also be non-contestable in certain situations. One such situation is when an issuer does not allow a network to process CP PINless transactions and the network's PIN option is unavailable for some reason, e.g., the merchant does not prompt the customer to enter a PIN. Another situation where CNP transactions may be non-contestable arises when they are tokenized.[7] For instance, a small fraction of CNP tokenized transactions were processed by an unaffiliated network in 2023. Sometimes, acquirers also cannot enable smaller PIN networks.

99.     A significant percentage of Visa-branded debit card transactions are non-contestable for the reasons described above and because issuers—occasionally at Visa's urging—generally do not

---

[7] Tokenizing is an encryption technology used to facilitate some Visa-branded transactions initiated online, in a mobile app, or with a digital wallet.

enable CNP PINless transactions. This deters merchants and acquirers from enabling CNP PINless transactions, making them essentially non-contestable.

100.    Given these marketplace realities, merchants either must accept Visa or lose a significant number of sales and revenue. Unsurprisingly, virtually all merchants "choose" the former route and accept Visa because a massive amount, and predominant proportion, of consumers use Visa-branded cards. As a result, virtually all merchants route, at minimum, non-contestable transactions to Visa instead of using cheaper back-of-card networks.

### 3. Fintech Companies Have Been Unable to Meaningfully Compete for Debit Transactions Despite Superior Products and Lower Prices.

101.    Although consumers in the United States commonly make debit purchases using debit cards and the traditional networks that power them, another, more modern way exists to make such purchases. This way utilizes innovative, alternative rails—methods that allow acquirers and issuers to communicate to facilitate transactions—that fintech companies have developed more recently.

102.    A fintech debit network facilitates consumer payments to merchants by providing end-to-end similar and functionality equivalent to that of a traditional debit card network.

103.    Fintech debit networks authorize payments from a consumer's bank account, facilitate communications with the consumer's bank to authorize and clear the transaction, and provide settlement services by initiating payment to the merchant's bank. These networks also can transfer funds to a merchant's financial institution by using lower-cost alternatives to Visa's debit networks, like money transfer services available to banks, i.e., Automated Clearing House (ACH) or Real Time Payment (RTP) networks.

104.    Visa knows that these alternative fintech debit networks threaten its place as the dominant network for processing debiting transactions because they could provide the same functionality as Visa's and other debit networks, like a credential for use at merchants, payment

guarantees, the ability to dispute charges, chargeback capabilities, and fraud protection, at a lower price.

105.    Visa has acted systematically and decisively to stamp out fintech companies' pursuit of alternative networks for processing debit transactions that that would compete with Visa's debit network and represent a serious threat to its continued market dominance.

### C. **Visa Has Employed a Campaign of Exclusionary Conduct to Obtain and Maintain Dominance in the Domestic Debit Network Industry.**

106.    Visa is one of the most profitable companies in the United States and worldwide, and its monopolistic conduct in the domestic debit network market has allowed it to maintain this position.

107.    In 2022, Visa reported $18.8 billion in global operating income and profit margins of an astounding 83%.Visa's United States debit business is its largest source of revenue globally, exceeding revenue obtained from its credit business and debit business in any other part of the world. Visa charges over $7 billion in network fees annually on United States debit volume, earning it $5.6 billion in net revenue.

108.    Neither regulatory changes, nor the rise of e-commerce and mobile payments, nor the emergence of disruptive new technologies have reduced meaningfully Visa's domestic general-purpose debit network market dominance. Visa's network now processes over 60% of debit transactions and 65% of CNP debit transactions in the United States.

109.    At year-end 2023, Visa accounted for nearly 60% of the total dollar amount of U.S. debit-card purchases, while its closest competitor, Mastercard, accounted for slightly more than 20%, according to Nilson Report, a trade publication. The following chart from this publication shows that between 2012 and 2013, Visa increased its share of the domestic debit card market by purchase volume by almost 10%—from 50.54% to 59.03%—while Mastercard's market share increased less than one

percent—from 20.5% to 20.45%—and smaller debit networks' combined share decreased by nearly seven percent—from 19.4% to 12.54%.



110.    By contrast, according to the Nilson Report, Visa has an appreciably lower market share in the domestic credit card market by purchase volume. As of year-end 2023, Visa possessed less than 50% of the market, with 49.5%. Its share has been flat since 2017 and has not met 50% during this span or the prior 2012-2017 span, when its share moved from 40% to 49.4%.

111.    Between 2012 and 2024, Visa's annual net income has risen substantially, as the following graph based on data from Visa and FactSet illustrates (with 2024 being an estimate):



112.    Visa's stock price has increased in similar fashion between 2015 and 2023, as the following graph based on data sourced from Refinitiv DataStream reveals:



113.    As Visa has charged supracompetitive fees, depressed price competition, and stifled product quality and innovation in the domestic debit industry, its share of debit transactions and CNP debit transactions steadily has increased.

114.    Visa has maintained its general-purpose debit network monopoly in the United States by engaging in two main types of exclusionary conduct: (1) prohibiting smaller competitors' debit

networks from achieving the scale needed to meaningfully compete; and (2) preventing potential competitors from entering the market.

115.    First, Visa preserves its monopoly against smaller competitors, like PIN networks, by preventing them from scaling with merchants, acquirers, consumers, and issuers. Visa has employed coercive deals that force merchants or their acquirers to route available transactions through the Visa network, thereby locking in merchant debit volume. Visa also locks in issuers by paying them to limit merchants' and acquirers' ability to process payments using PIN networks, such as by refusing to enable PINless routing. If merchants or their acquirers do not accede to these strong-arm tactics, then Visa subjects them to higher fees. Unsurprisingly, this rarely happens. Visa's conduct has produced more non-contestable transactions that enable it to maintain its leverage over both issuers and acquirers and prevents PIN networks from achieving the scale that would allow merchants to broadly enable their use.

116.    Second, Visa has utilized arrangements with actual and potential competitors in the fintech space that have caused these entities to not introduce or promote innovations that otherwise could supplant the dominance of Visa's traditional debit network. If these potential competitors refuse Visa's anticompetitive entreaties, Visa retaliates by imposing significant penalties on them via increased fees for existing products, that effectively give them no choice but to give in to Visa's demands.

117.    Discussing the concept underlying the "partnership" model Visa has deployed to great effect to preserve its market position from serious competitive threats, traditional and innovative alike, Visa's former Chief Financial Officer stated:

> **[E]verybody is a friend and partner. Nobody is a competitor.** . . . The only issue is to figure out how to make it worth their while to partner with us. And so far, we've managed to do that, **whether it's with wallets, whether it's with large tech companies, whether it's with large merchants**. And as long as we keep doing that and keep our network valuable for everyone **things should be fine**.

DOJ Visa Compl. ¶ 110 (emphasis added).

### 1. Visa Prevents Meaningful Competition from PIN Networks.

118.    Visa's dominance of the debit network market did not happen by accident or innovation. It resulted from an intentional strategy to protect its debit transaction volume and prevent competition. To this day, Visa continues to suppress competition from smaller debit networks like PIN networks and undermine competition-promoting laws like the Durbin Amendment.

119.    The Durbin Amendment, enacted in 2012, presented a threat to Visa's debit network monopoly because it required all debit cards to support at least one network unaffiliated with the front-of-card network. This meant that Visa-branded cards would need at least one non-Visa-affiliated network. Congress hoped this measure would promote competition between debit networks by giving merchants and acquirers a choice to run transactions on a network other than the front-of-card network.

120.    Regulation II, which the Federal Reserve adopted in 2023, aimed to promote competition. It clarified that the Durbin Amendment required issuers to enable at least one back-of-card network that is not affiliated with the front-of-card network for CNP transactions.

121.    In the face of these potentially competition-enhancing changes to the domestic general-purpose debit network markets, Visa acted quickly to preserve its dominant position by preventing PIN networks, certain large merchants, and other companies that worked with debit networks from shifting volume away from its debit network.

122.    Visa has accomplished this by leveraging merchants' and banks' reliance on Visa for certain non-contestable transactions to limit the Durbin Amendments' effects. Even post-Durbin Amendment, Visa knew that 45% of CP transactions where Visa was the front-of-card network would be non-contestable, and that an even higher percentage of CNP transactions on Visa-branded cards would non-contestable. Simply put, Visa recognized that merchants and acquirers would need to use the front-of-card network for large swathes of CP and CNP transactions and that for 70% of debit

card payment volume, Visa's own debit network would be that front-of-card network. The scale of non-contestable claims that would have to be processed on Visa's debit network, even when another unaffiliated network was enabled back-of-card, would give Visa the power it needed to demand that merchants, acquirers, and issuers provide sizable volume commitments that would require merchants and acquirers to run and issuers to facilitate an overwhelmingly high proportion of Visa-eligible transactions on Visa's debit network.

123.    To extract these commitments, Visa has employed two methods: (1) penalizing merchants by charging them prohibitively high rack rates (list prices) completely untethered from incremental costs if they do not meet volume-based exclusivity requirements imposed on them; and (2) paying off acquirers, issuers, and some large merchants on the front end to ensure exclusivity.

### a. Visa Imposes Exclusionary Contract Terms on Merchants and Acquirers.

124.    Visa charges merchants steep annual penalties unless they process all or nearly all eligible debit transactions on Visa's debit network. Visa threatens to charge merchants high fees on non-contestable transactions that they must process using Visa's debit network unless the merchants also process nearly all contestable, Visa-eligible transactions on Visa's debit network. These tactics, detailed below, impede PIN networks' ability to compete with Visa for debit transactions.

125.    Visa forces certain large merchants and acquirers to sign routing contracts that have the purpose and effect of controlling the routing decisions for merchants that do not contract directly with Visa. Under these contracts, Visa requires the merchant to process all or nearly all Visa-eligible transactions on Visa's debit network under the threat of financial penalties for non-compliance.

126.    For example, Visa may contract with a merchant to get the top spot on the merchant's routing table, a ranked list used to decide which network should be used to process a given transaction. If the merchant does not put Visa's debit network in a spot at the top of the routing table, then Visa may charge the merchant high rack rates on all Visa-routed transactions.

127.    To avoid paying these prohibitively high rack rates, large merchants accounting for hundreds of billions of dollars in 2023 debit payment volume "agreed" to process 100% of eligible debit transaction volume on Visa's debit network.

128.    Visa forces these merchants to accede to its exclusionary provisions not only under the threat of high rack rates for non-compliance, but also by paying them off at the front end for acceding to these provisions. For example, Visa paid one large merchant $20 million under such an arrangement.

129.    Although the pricing terms may vary to some extent among merchants and acquirers, all or nearly all of Visa's coercive agreements include a provision requiring merchants and acquirers to commit to processing substantial Visa-eligible debit volume through Visa's own debit network. By imposing these exclusionary contracts on large merchants and acquirers, Visa has artificially inflated merchants' costs associated with Visa debit transactions if they process transactions on non-Visa debit networks.

130.    Visa has gone so far as to terminate these contracts and claw back the front-end payoffs to merchants when they have fallen short of the exclusivity requirements.

131.    Contract termination affects a merchants' debit and credit transactions because the network fees covered under the contract apply to both.  And Visa sometimes uses credit interchange discounts to win debit transactions.

132.    Visa's onerous contractual volume requirements use cliff pricing or all unit pricing to strong-arm merchants to acquiesce. Visa charges lower, yet still artificially inflated, prices to merchants on transactions processed on Visa's debit network if the merchants' or their acquirers' total volume exceeds its commitment. If the merchants fall short, however, Visa imposes much higher rack rates on every transaction from that merchant processed on Visa's debit network. In other words, Visa

permits merchants to pay a lower, yet still supra-competitive, price to it, but only on the condition that they adhere to its exclusionary volume commitments.

133.     Unless a limited safe harbor provision applies in a particular contract, even a .01% shortfall on a merchant's mandated volume enables Visa to charge significant monetary penalties on every transaction the merchant processes on Visa's debit network. Each penalty thus imposes an additional cost on the merchant for processing a debit transaction on non-Visa network and effectively prohibits merchants from processing debit transactions with Visa's competitors, who are thus denied the scale needed to meaningfully compete.

134.     Merchants and acquirers have no real choice but to "accept" Visa's terms because they have many non-contestable transactions that they must process on Visa's debit network. This means that merchants must either agree to Visa's volume commitments or pay supracompetitive rack rates on non-contestable transactions that must go through Visa's debit network as a penalty for routing any contestable debit transactions through the competition.

135.     Although Visa's rack rates exceed PIN networks' rack rates, merchants do not defect to the PIN networks. That is because Visa uses it control over non-contestable debit transaction to force merchants to agree to volume commitments (usually 90% to 100% of Visa-eligible debit volume) that exceed what Visa could obtain in a competitive market.

136.     An example illustrates the punitive, and ultimately anticompetitive, nature of these agreements. A merchant signs a cliff pricing agreement with Visa. One day, the merchant serves 100 customers who present Visa-branded debit cards with the Visa network front-of-card and the same back-of-card network. Fifty customers make their purchase online. The other 50 make their purchases in person, but their cards are not enabled for CP PINless transactions on the back-of-card network, and they do not enter a PIN. The online orders may be contestable by the non-Visa network, but the in-person purchases are non-contestable because they cannot be processed on the back-of-card

network and must go through Visa's network. Per the cliff pricing agreement Visa imposed on this merchant, the merchant can avoid high rack rates on the 50 non-contestable claims only if it also routes the 50 contestable transactions to Visa. The rack rate for the transactions would be $.50 per transaction, but if the merchant processes all 100 claims on Visa's debit network, then the rate drops to $.25 per transaction.

137.    In this scenario, the merchant has every incentive to and almost certainly will process all 100 transactions on Visa's debit network. If it does so, it will pay $.25 on 100 transactions, or $25. If it does note, then it will pay $.50 on the 50 non-contestable transactions, or $25, <u>plus</u> whatever fee the back-of-card network would charge to process the remaining transactions. Unless the back-of-card network offered to do this for free, then the merchant will pay more in the aggregate to process the contestable transactions with the non-Visa network—even if that network charges substantially lower fees that Visa. Because PIN networks generally cannot process transactions for free, the merchant either pays $25 for Visa to process all its transactions or it pays Visa $25 to process half its transactions and then pays the back-of-card networks' fee to process the remaining 50. Given this pricing structure, merchants have no real choice but to process all 100 transactions with Visa's network.

138.    Visa has so much market power that even some acquirer processors that operate rival PIN networks have had little choice but to accede to their own Visa-imposed exclusive routing agreements. As part of these agreements, Visa pays money to them in exchange for similarly high and exclusionary volume commitments. These contracts further disincentivize the PIN networks from competing more vigorously with Visa's debit network.

139.    Due to Visa's conduct, pulling a meaningful number of transactions away from Visa's debit network would require PIN networks to not only offer cheaper per-transaction prices than Visa, but also compensate the merchant for the penalty Visa will impose on the transactions that the

merchant must still route through Visa's network, which is larger than the set of transactions for which the PIN network can compete. Such a route would be untenable, however, as the merchant would need to impose zero or even negative per-transaction prices.

140.    This dynamic is not lost on Visa. These exclusionary actions have helped protect its domestic general-purpose debit network monopoly and permitted it to continue to charge supracompetitive fees on debit transactions. Indeed, Visa's profits would decrease if it reduced its fees because of how many non-contestable transactions it has. And lowering its rack rates would reduce its leverage to get merchants and acquirers to accede to these extreme volume requirements. Simply put, Visa does not compete for debit transactions on the merits. Rather, it engages in cliff pricing and maintains artificially high prices as tools to protect its supracompetitive profits and to prevent meaningful competition that would reduce these profits.

141.    Visa's anticompetitive behavior does not end there. To capture even more debit transaction volume, Visa occasionally prices other products—like credit transactions—based on a merchant's debit volume.

142.    For example, to encourage to Google to process debit transactions on Visa's debit network and prevent it from enabling PINless networks, Visa offered Google credit network incentives. Visa took a similar approach with a health food supermarket chain.

143.    Visa knows that merchants cannot process contestable debit transactions on non-Visa debit networks if that means that they will pay higher fees on non-contestable debit transactions and credit transactions that are processed on Visa's network. Unlike Visa, PIN networks have no credit businesses that give them additional levers to pull to attract and keep debit transaction volume.

144.    To further entrench its monopoly power in the debit network market and to prevent other networks from obtaining sufficient debit transaction volume to challenge its power, Visa also

has introduced new fees that it then can waive to obtain exceedingly restrictive volume commitments from merchants.

145.    For instance, in 2012, after enactment of the Durbin Amendment, Visa introduced the FANF. FANF charges merchants a fixed monthly fee, through their acquirers, for accepting Visa debit transactions. Since its introduction, Visa has raised the FANF twice. Visa uses its willingness to waive the FANF as another form of leverage to coerce exclusionary volume requirements from merchants and acquirers that has further cemented its debit network monopoly.

### b. *Visa Imposes Exclusionary Contract Terms on Issuers.*

146.    Issuers ostensibly can choose the number and identity of debit networks included on debit cards. The Durbin Amendment sought to promote competition in the debit network market by requiring at least one additional network not affiliated with the front-of-card network—usually Visa—on each card. This requirement forced issuers to enable at least two networks and give merchants more choices, promoting competition, at least theoretically. In practice, however, Visa has used its monopoly power to suppress competition by inducing issuers to severely limit potential competitors' enablement on debit cards.

147.    For example, Visa's issuing contract with JPMorgan Chase requires that a staggering 90% of Chase-issued Visa-branded debit cards enable only one unaffiliated PIN network.

148.    In addition, in 2023, Visa executed a contract with one of its largest debit-issuing fintech customers that permits only one non-Visa network on all debit cards issued through that customer's issuer.

149.    The contractual provisions that Visa has imposed on almost 1,000 issuers, large and small alike, accomplish the same anticompetitive goal: to effectively prevent the listing of additional networks on debit cards by using functionally exclusive volume requirements.

150.    These contracts' standard relevant requirements dictate that if the given issuer's annual growth of Visa debit transactions does not keep pace with Visa's nationwide debit growth, Visa can impose significant financial penalties on that issuer. These penalties include early termination fees of both a percentage of benefits already received and a fixed multimillion dollar amount. Visa relies on these punitive contractual terms to maintain its stranglehold on issuer transactions in the domestic general-purpose debit network markets.

151.    Visa's onerous volume-based requirements force issuers to decline adding additional networks and enabling additional transaction types—such as PINless routing—for existing networks.

152.    For example, a 2020 Visa issuing contract's minimum volume requirement aimed to prevent a shift to PINless networks or Real Time Payment. Visa wrote the contract to prevent issuers from shifting to PINless by requiring them to disable a PINless network if the PINless network obtained more than a minimal amount of transaction volume.

153.    Visa also has agreed to pay many large issuers incremental debit network incentives that have made it harder for those issuers to enable PINless or face-to-face transactions.

154.    Moreover, Visa contracts with issuer processors on which many smaller issuers rely to select networks that dissuade those processors from selecting and enabling PINless networks.

155.    The contractual provisions that Visa has forced on issuers have reinforced the monopoly-protecting effect that Visa's exclusivity-based contractual terms imposed on merchants and acquirers have had. Together, these coercive measures have played a significant role in allowing Visa to erect and fortify the large artificial barriers to entry and expansion in the relevant markets that competitors face by expanding the percentage of non-contestable transaction volume Visa enjoys. Only networks enabled on Visa-branded debit cards can even compete for the transaction, regardless of which network a merchant may prefer. And Visa can process over 70% of debit card volume in the United States because of its status as the dominant front-of-card network.

156.    The relevant contractual provisions Visa has included in its issuer contracts feature the same type of onerous cliff pricing and corresponding penalties cliff pricing contained in its routing contracts with merchants and acquirers. Under these terms, Visa can inflict major penalties across all Visa transactions, not just marginal ones, if the issuer has any meaningful shortfall, and if an issuer does not achieve the mandated level of Visa exclusivity in a given year, Visa can impose severe financial penalties.

157.    Visa uses other products, like its Debit Processing Services, in carrot and stick fashion with respect to issuers like it does for merchants and issuers. Visa deploys such products as carrots to win issuer routing volume by giving issuers "discounts" if exclusionary thresholds are met, while using these as sticks by taking away such "discounts" and replacing them with penalties whenever the issuers do not meet such thresholds.

158.    Visa also bundles its card-brand issuance contracts with its Debit Processing Services to win large banks' business.

### 2.    Visa Strengthens its Control After Passage of the 2012 Durbin Amendment.

159.    Following the Durbin Amendment's enactment, Visa feared that competition from rival PIN networks would threaten its monopoly position in the debit network market. But although the Durbin Amendment initially succeeded in allowing smaller PIN networks to gain market share from VISA, Visa acted to entrench its dominance. In the 14 years since the Durbin Amendment became law, and even though PIN networks offer lower prices, Visa has solidified and expanded its market share and monopoly position in the debit network market.

160.    In the years immediately following the Durbin Amendment's passage, smaller networks attempted to challenge Visa's monopoly. For example, Mastercard launched a PINless program for Maestro that targeted Visa-branded debit cards. These attempts ultimately failed because

Visa repeatedly and consistently abused its dominant scale and non-contestable transaction position to penalize any merchant, acquirer, or issuer that tried to explore these alternatives.

161.    Visa reacted to threats to its dominance by deploying de facto exclusive transaction provisions in contracts forced on its counterparties to secure the entities that control routing decisions. Presently, Visa has de facto exclusive routing contracts with more than 180 of its largest merchant and acquirer customers. Visa's merchant and acquirer contracts cover more than 75% of Visa's debit volume, which lets Visa foreclose at least 45% of the United States' total debit volume.

162.    These de facto exclusive contracts have prevented actual and potential competitors alike from achieving the scale needed to compete effectively with Visa in the debit network market. When merchants overwhelmingly process debit transactions on Visa's network, issuers have less incentive to add additional, non-Visa networks to their debit cards. Visa's onerous issuer contracts have enhanced this effect. Visa has gained additional control over merchants and acquirers by effectively forcing issuers to make more transactions non-contestable by, for example, disabling or not enabling CP PINless transactions.

163.    Visa launched a comparable campaign to entrench its dominance in response to and before the effective date of Regulation II, the Federal Reserve's October 2022 clarification of the Durbin Amendment's implementing rules. Specifically, Visa took steps to lock up volume under routing deals, renew existing merchant and acquirer agreements, and sign new merchant and acquirer contracts for longer commitments with early termination fees.

### 3. Visa Uses its Dominance to Prevent Competitors from Obtaining Significant Market Share.

164.    Visa has achieved scale on both sides of its two-sided debit transaction network (accountholders and issuers on one side, merchants and acquirers on the other), allowing it to durably and effectively entrench its monopoly through network effects. By locking up both sides of the

domestic general-purpose debit network markets in exclusionary contracts, Visa has prevented any other network from meaningfully competing for market share.

165.    On the market's issuer side, Visa incentivizes its customers to provide fewer non-Visa network and routing options. It becomes more burdensome and expensive—and less beneficial—for merchants and acquirers to enable routing to these Visa competitors because fewer issuers enable Visa's PIN network competitors or all their features. Accordingly, these competitor networks cannot achieve an efficient scale or improve features, creating a negative feedback loop. Visa's anticompetitive conduct causes them to lack the usage or acceptance to meaningfully compete, which allows Visa to more deeply entrench its monopoly.

166.    Visa dominates the non-contestable transaction market and uses this dominance to require and enforce de facto exclusive contracts. Thus, to compete with Visa, competitor PIN networks must provide a better, cheaper service than Visa, and they also must compensate merchants, acquirers, and issuers for the steep penalties that Visa imposes for failing to meet the exclusionary terms of its de facto exclusive contracts.

167.    Visa's web of anticompetitive practices has made it virtually impossible for competitor networks, including PIN networks and its smaller rival credit card networks, to win any meaningful degree of debit network market share from Visa.

168.    Despite the PIN networks' lower prices, development of innovative features and services, and increased placement back-of-card (as required by the Durbin Amendment), Visa's anticompetitive conduct has prevented PIN networks from obtaining enough traction on either side of the market to overcome Visa's powerful network effects.

169.    More than a decade after the Durbin Amendment took effect, PIN networks—collectively—have managed to process only 11% of all debit transactions and only 5% of CNP transactions in the United States. No PIN network has more than a single-digit market share.

170.    Mastercard, which is Visa's only longstanding debit network rival and possesses only about a 25% market share, also has been unable to gain market share or restrain Visa's monopoly due to Visa's anticompetitive conduct. Visa has engineered anticompetitive long-term contracts with many of the country's largest financial institutions that severely restrict their ability to issue Mastercard debit cards.

171.    Like it has done with Mastercard, Visa also has hamstrung other smaller rivals by either constructing artificial technical barriers, entering into restrictive agreements that prevent rivals from growing their market share, or both.

172.    This lack of scale has prevented smaller networks from offering fraud protections that are as fast and accurate as Visa's because networks need a critical mass of transaction data to reliably detect fraud. Visa recognizes that this further enables it to win market share despite competing networks' lower prices.

173.    The market dynamics Visa has helped forge have let it engage in even more anticompetitive conduct to further entrench its monopoly.

174.    For example, in 2023, issuers permitted less than half of total debit volume in the United States to be processed as CP PINless transactions, which caused many merchants to not enable such transactions. Visa fears that an increase in CP PINless transactions would benefit its competitors and that one large issuer enabling such transactions might create a tipping point toward their widespread availability. Given these fears, Visa took steps to ensure that the tipping point was never reached.

175.    In 2023, JPMorgan Chase, which issued Visa-branded debit cards with Mastercard's Maestro back-of-card, requested relief from a Visa contract provision preventing the addition of a second back-of-card network in order to comply with Regulation II. Specifically, JPMorgan Chase

sought to add Discover's Pulse network because, unlike Maestro, Pulse offered both CP and CNP PINless functionality.

176.     Visa feared that JPMorgan Chase adding Pulse could create the tipping point for merchants and acquirers that could cause a sizable amount of merchant volume being enabled for PINless transactions. If that happened, Visa worried that PINless networks would price a significant amount of CNP transactions lower than Visa, causing more merchants to adopt PINless networks and Visa to lose transaction volume and lower its prices accordingly. Given these concerns, Visa gave JPMorgan Chase only a short-term waiver to temporarily add Pulse while requiring it to sign a new debit-routing agreement.

### D.  **Visa Prevents Meaningful Competition from Fintech Companies.**

177.     In addition to the debit card network that Visa dominates, there exist alternative ways for consumers to pay merchants directly from their bank accounts without a debit card. These alternative payment methods—like alternative debit networks that fintech companies have developed—could entirely remove Visa from its middleman role in debit transactions over time in a competitive market.

178.     Fintech debit networks use consumers' bank account numbers, rather than debit cards, to enable consumers to make purchases directly from their accounts. By storing consumers' bank credentials, these alternative debit networks let accountholders purchase from merchants that participate in their networks without a traditional debit network like Visa's.

179.     Innovations like these already have happened abroad. If replicated domestically, these alternative networks would pose an existential threat to Visa's debit network business. In response, to this existential threat, Visa acted consistently and decisively.

180.     Alternative debit competitors can assume various forms.

181.    <u>Digital wallets,</u> like Apple Pay, PayPal, and Google Play, are one notable type of alternative. Digital wallets are software-based products that store consumers' payment information (usually on a smartphone or computer) and use it to fund purchases from merchants. Digital wallets come in two primary forms: staged wallets (also known as stored value wallets); and pass-through wallets.

182.    <u>Staged wallets</u>, like PayPal, Square's CashApp, and Google Wallet (formerly Google Pay), are used by consumers to make purchases using funds stored in the wallet's account and can support peer-to-peer transfers and cryptocurrencies. With this type of wallet, consumers may preload or transfer funds into the wallet from a linked bank account. Staged wallets also store tokenized payment details but don't transmit them. Instead, this type of digital wallet enables transactions in two stages. At the funding stage, the wallet acquires money from a customer's bank account or other source. At the payment stage, the wallet then sends the customer's funds to a merchant. A staged wallet provider also can make additional fraud assessments based on details of a particular transaction to which it is privy but of which a payment network or card issuer may be unaware.

183.    The following graphic illustrates how staged wallets work:



184.    <u>Pass-through wallets</u>, like Apple Pay and Samsung Wallet, keep tokens that link a consumer's debit card as opposed to storing sensitive financial data or funds directly. They do not take part in transferring funds. Rather, these wallets transmit the consumer's payment information directly via an encrypted token to the merchant's acquirer, which then processes the payment much like a traditional debit-card transaction. During further processing, the token travels through the debit payment network to be decrypted and checked against the actual card or account information in the issuing bank. After verification, the payment gets approved and sent to a merchant's acquiring bank. Only the network and an issuing bank will know the actual card or account details. Known for their high security features, pass-through wallets practically serve as an extensions of debit cards, and they therefore are more popular in regions with high debit card adoption like Europe and North America.

185.    The following graphic illustrates how pass-through wallets work:



186.    Fintech debit networks need buy-in from a critical mass of consumers who enroll in the fintech network and a critical mass of merchants who accept the network to succeed. Digital wallets are particularly threatening to Visa's domestic general-purpose debit network market monopoly because they can achieve the necessary scale on both sides of the market to succeed as independent payment platforms. Indeed, tech companies like Apple, PayPal, and Square, who boast millions of participating merchants and over one hundred million accountholders in the United States

alone, already have the critical mass on both sides of the market needed to succeed in a competitive industry.

187.    The grave risk that these companies present is well known to Visa. For instance, Visa knew that Apple discussed building a new Visa-less debit network with a large issuer. Visa also knew that if Apple succeeded in building a viable debit network without Visa's payment rails, this would jeopardize its debit network dominance.

188.    Although Visa recognizes that nascent fintech debit competitors present a threat similar to that posed by more traditional competitors to its debit network market dominance, it has taken a somewhat different approach to thwarting competition from these upstart players—Visa has induced these firms to be "partners" instead of competitors.

189.    Starting in 2013, Visa began a campaign of utilizing its debit network market dominance to stymie and coopt these innovators under its "partnership" model. Visa's strategy of paying these firms cash and lowering their fees in exchange for staying out of its turf has succeeded in increasing and protecting its monopoly position.

190.    The rise of mobile payments over the last decade has coincided with a large rise in online debit transaction volume. But despite the feasibility of alternatives to traditional debit payments (which have been adopted in other countries), innovative new technologies continue through Visa's network in the United States. Fintech companies' inability to develop and bring viable payment alternatives to market so far has not resulted from competition on the merits. Rather, this has resulted from Visa's calculated strategy of wielding its monopoly power to prevent this from happening.

191.    Since these potential debit alternatives have emerged, Visa has remained wary of any technology that could threaten its role as the middleman between both sides of debit transactions. Thus, when these potential alternatives have arisen, Visa has "partnered" with them before they can become disruptive instead of competing against them on price or quality.

192.    Visa has "partnered" with these potentially disruptive competitors, in part, by sharing a small sliver of its monopoly profits with them to ward off disintermediation, including by using custom incentive programs through which Visa's largest merchants exchange disintermediation/non-discrimination protections, non-disparagement, and future commitments. Visa recognizes that these partnerships, which seem to double as little more than horizontal product market allocations, have no other justifiable economic rationale besides protecting its dominant debit network position.

193.    Visa's concerns about disintermediation are not new. For much of the last decade, Visa has known that fintech alternatives could circumvent its role as middleman between both sides of a debit transaction and threaten its monopoly. Like a debit network, a fintech network can authorize payments from a consumer's bank, clear transactions with a consumer's bank, and settle transactions by remitting payment to merchants' financial institutions. These fintech alternatives also can do more, like provide payment guarantees for merchants, fraud protections, and dispute resolution and chargeback services.

194.    Recent developments only have heightened Visa's wariness of innovative alternatives making inroads into its debit network market position.

195.    Alternative payment rails that facilitate real-time money transfers have become increasingly available, and a growing number of fintech companies could build on these rails to meaningfully compete with Visa in a fair and open market. By enabling direct mobile transfers, these companies pose a particular threat to Visa's highly profitable dominance of CNP transactions. Furthermore, payment processors, banks, and other firms that can connect issuers and merchants all can integrate these fintech debit services.

196.    These threats have caused Visa to proclaim that real-time fintech money transfers "will become a viable merchant option: ***positioned and priced as a 'Substitute for Debit.'***" DOJ Visa Compl. ¶ 114 (emphasis added).

197.    Visa also has worried that Big Tech companies may develop widespread alternative payment networks that allow customers to pay directly from their bank account and entirely displace card-based funding options. These concerns have only worsened with the development of viable, cheaper, non-card-based alternative payment rails.

198.    For decades, payment networks have facilitated bank transfers using Automated Clearing House (ACH), an interbank payment service. But ACH takes many days to settle a payment and takes even longer before the payment appears in a consumer's account. This limited its usefulness for real-time transfers.

199.    Recent developments by innovative fintech firms have improved ACH, however, both by building new capabilities on ACH and by developing real-time payments (RTP)—a new infrastructure that is a faster ACH alternative.

200.    For example, in 2017, The Clearing House launched RTP network, which allowed for immediate transaction clearance and settlement. And in 2023, the Federal Reserve launched FedNow, which allowed for instant payments between depository institutions.

201.    As more banks connect to these payment alternatives, they could facilitate near-instant payment transfers without debit card networks. But despite these developments, few digital wallets or debit payment alternatives have incorporated these real-time payment networks. This lack of progress is directly attributable and caused by Visa's anticompetitive conduct.

**1.  Visa Prevents Real Competition from Staged Wallets.**

202.    Visa has threatened to penalize staged wallets companies who rely on it for critical business and services with substantial fees to thwart the rise of meaningful competition from this sector of the fintech industry. Visa views this strategy as another important bulwark against disintermediation.

203.    Under its approach for these potential competitors, Visa agrees to waive the staged wallet fee if and only if the staged wallet firm agrees to Visa's exclusionary terms. The threat of these fees and the possibility of its waiver force these companies to agree to Visa's anticompetitive provisions. That is because paying these substantial fees—which function as a prohibitive penalty— would make their continued presence in the debit network market unprofitable.

204.    Since 2016, every staged wallet that has faced Visa's threatened punitive fees, including PayPal and Square, has had no realistic choice but to cede to Visa's anticompetitive demands.

### a.    Visa's Anticompetitive Actions Against PayPal in 2016 Forced it to Stand Down.

205.    PayPal is the only major entity that has managed to ever successfully disintermediate Visa, according to one Visa executive. But this disintermediation was short-lived as a direct result of Visa's retaliatory actions. In 2016, only a matter of months after the disintermediation happened, PayPal was forced to cut a deal with Visa where it essentially agreed to stop competing with Visa' debit network. Visa took a page out of its standard playbook—flaunting big payouts as a carrot, wielding punitive fees as a stick—to buy off PayPal and bring its debit transaction volume back onto Visa's debit network.

206.    As merchants expanded into e-commerce in the 2000s and early 2010s, many started accepting PayPal as a method of online payment. Visa supported PayPal initially. In fact, PayPal brought sizable volume to Visa's rails because some PayPal customers used Visa debit cards to pay for online transactions.

207.    But in 2015, PayPal spun off from former owner eBay. This development made Visa concerned that PayPal would more aggressively pursue its disintermediation goals. Visa worried that PayPal's growing scale and encouragement of customers to pay directly through their bank accounts—

rather than through debit or credit cards—would significantly increase the risk of Visa's disintermediation.[8]

208.    Visa's concern became a reality, at least for a short while, in 2016. That year, PayPal attempted to divert business from traditional online debit providers, primarily Visa, by using lower-cost payment methods that moved money through ACH.

209.    Visa's then-CEO, Charlie Scharf, responded by publicly threatening PayPal. At a 2016 conference, he said that PayPal needed to change its business model, before warning that Visa would "***compete with them in ways people have never seen before***." DOJ Visa-Plaid Compl. ¶ 46 (emphasis added).  Scharf added: "***If you are a foe, you're not a friend.***"

210.    After making these threats, Visa decided to use its monopoly power to head off the competitive threat that PayPal posed before the situation could become uncontrollable.

211.    Although PayPal encouraged customers to pay directly through their bank accounts using ACH, many users still chose to pay using Visa-branded debit cards. Due to this debit volume, Visa could and did threaten prohibitive wallet fees and rack rates unless PayPal agreed to a routing contract.

212.    Visa ultimately succeeded in forcing PayPal to capitulate by getting it to stop promoting alternative payment methods and instead to promote Visa debit.

213.    As Visa's Senior Vice President and Head of Product for North America explained, PayPal has been less of a threat to Visa's online debit business in recent years because "***Visa and PayPal have figured out a way to be partners, as opposed to, sort of, direct competitors***" and have

---

[8] As a staged wallet, PayPal users loaded funds into their PayPal wallet using their bank credentials. PayPal users then could make purchases using ACH. These ACH transactions had many of the same benefits as debit card transactions, such as dispute procedures, fraud protection, and fund guarantees.

found "ways to ***work together***, as opposed to not work together." DOJ Visa-Plaid Compl. ¶ 46 (emphasis added).

214.    Visa also has used its market power to undermine PayPal's efforts to partner with brick-and-mortar merchants and bring its business model in-store.

215.    Specifically, Visa restricted ACH transactions for all customers who had Visa-branded cards in their PayPal wallets. Although Visa loosened these restrictions in 2021, it still demanded information from PayPal that it has used to monitor PayPal's product performance. In addition, Visa's restrictions have made it so that consumers only can use PayPal's in-store ACH option if they first scan a merchant's QR code and then connect to PayPal to approve the transaction. Not surprisingly, this clunky and inefficient procedure substantially has limited PayPal's use as an in-store alternative to a Visa debit card.

216.    Visa's continued dominance of the debit network market and threat of exorbitant wallet fees gave PayPal little choice but to agree to Visa's coercive demands. In 2022, PayPal and Visa signed a 10-year contract requiring PayPal to route 100% of its Visa-eligible volume from years four to ten of the contract. The contract also provides for significant penalties to PayPal upon failure to convert its co-branded debit cards to Visa, the preservation of Visa's "customer choice" provisions favoring Visa payments, and requirements that PayPal participate in specified Visa programs and services.

### b.    Visa's Anticompetitive Actions Against Square Between 2014 and 2023 Forced It to Stand Down.

217.    Visa has coerced Square into signing anticompetitive agreements that prevent it from meaningfully competing with Visa or developing a viable payment alternative in the debit network market.

218.    Square wanted to facilitate debit payments between users while avoiding additional Visa fees, so it developed Square Cash (now known as Cash App) to facilitate peer-to-peer payment.

A peer-to-peer ACH routing option threatened Visa's debit payment volume. If Square were to acquire a critical mass of bank account credentials from peer-to-peer transactions, it could use that information to launch a consumer-to-merchant debit competitor. This possibility caused Visa to fear that Square planned to build an ACH option if Visa did not contract directly with Square.

219.    Thus, Visa offered to not charge high rates to Square Cash for debit transactions using Visa's network in exchange for retaining the right to terminate the contract if Square began competing with Visa. This solution would provide two main benefits to Visa: (1) Square's commitment to process its debit volume on Visa's debit network and (2) non-disintermediation.

220.    Visa signed its first multi-year contract with Square containing these key anticompetitive provisions in 2014. Pursuant to that deal, according to the new DOJ complaint, Visa gave Square a break on the fees for many purchases and Square agreed to give priority to sending Visa debit-card transactions through Visa instead of the other networks. Visa also gave fee concessions to Square when Visa debit cards were used on Cash App. Visa reserved its right to cancel this arrangement if Square breached any of its commitments to Visa.

221.    After signing the 2014 contract, a Visa executive stated that "***we've got Square on a short leash***." Thus, Visa thought that it had sufficiently insulated itself from the competitive risk that Square had posed.

222.    But in 2016, Square announced the release of a new product called Cash Drawer. Like PayPal and its peer-to-peer platform, Venmo, Cash Drawer permitted users to store funds in their Square Cash account.

223.    Cash Drawer's launch rekindled Visa's fears about disintermediation and the decline of its debit network market dominance. In response, Visa threatened Square with termination of the parties' 2014 contract, telling Square that Visa viewed Cash Drawer as antithetical to the model that

the two had developed. Instead of facing the possibility of significantly higher fees and penalties on Visa debit transactions, Square promptly removed the feature. Visa did not terminate the contract.

224.    In 2021, Square launched Cash App Pay to allow customers to use Cash App to make purchases directly from merchants. Cash App Pay would have triggered Visa's staged wallet fees, so Square asked Visa to waive the fees. Visa feared the threat of disintermediation that Cash App Pay posed, but Visa also recognized that it could use the threat of punitive fees as leverage in future negotiations with Square.

225.    In 2023, Visa used this leverage to force Square into another anticompetitive agreement. This one required Square to send 97% of Cash App Pay transactions over Visa's rails, preference Visa during the Cash App Pay sign-up process, and not steer customers to ACH.

## 2. Visa Prevents Real Competition from Pass-Through Wallets.

226.    Visa also has used its monopoly power in the debit network market to thwart competition from potential competitors in the technology industry, like Google, Amazon, and Apple, that utilize pass-through wallets.

### a. Visa's Anticompetitive Actions Have Sidelined Big Tech Firms.

227.    Because many of these competitors—like Big Tech firms Google and Apple—are also Visa customers, Visa threatens them with prohibitively high rack rates, fees, and penalties to extract concessions from them that entrench Visa's debit dominance. Visa also uses its monopoly position in this market to pay off these potential competitors and further solidify its monopolist status and the supracompetitive profits that come with it.

228.    For Big Tech players, Visa creates custom packages that swap incentive arrangements on Visa-eligible debit transactions for agreements to not disintermediate or compete with Visa. These anticompetitive arrangements are little more than forms of horizontal product market allocation

whose primary purpose and effect is to allow Visa to retain its dominant debit network market position.

229.    Visa knows that incentive arrangements with Apple and Amazon are not focused on routing. As one Visa executive put it, the company's agreements with Apple and Amazon "are not routing deals, these are relationship give away deals that have nothing to do with routing." DOJ Visa Compl. ¶ 135. Even though these deals might cause Visa to make less money than it would in their absence in the short term, they financially benefit Visa in the long term by preventing the emergence of competition from some of the most highly capitalized and innovative companies on the planet.

### b.    *Visa's Anticompetitive Actions Against Apple in 2022 and 2023 Have Caused It to Refrain from Competing.*

230.    In 2014, Apple debuted the Apple Pay mobile wallet. In the ensuing years, Visa became increasingly concerned that Apple Pay would displace debit card payments. Visa responded to this grave competitive threat to its domestic debit business in the same manner it has done when faced with competitive threats from other companies: it induced Visa into a competition-killing "partnership" that has preserved its dominant position in the domestic general-purpose debit network markets.

231.    In 2022, Visa feared that its relationship with Apple had reached a "tipping point" because Apple had made forays into the traditional general-purpose debit network markets. According to the new DOJ complaint, Visa considered Apple Pay an "***existential threat***" to its domestic debit business and took action to protect its position.

232.    In response, Visa resorted to its standard playbook and "partnered" with Apple. Under this arrangement, Visa paid off Apple with a small share of its monopoly rents to help ensure its continued dominance in the domestic debit network market.

233.    In 2023, Visa paid Apple hundreds of millions of dollars and reduced its merchant fees (while continuing to benefit from Apple keeping its debit volume on Visa's network). But these benefits to Apple came at a substantial cost.

234.    Apple had to agree not to do several important things that would have increased competition significantly in the debit network market. First, Apple agreed not to create or launch any payment product or alternative payment technology aimed at competing with or disintermediating Visa, including by developing a functionality that relies primarily on non-Visa processes or products. Second, Apple agreed not to provide incentives that aim to disintermediate Visa or encourage customers not to use Visa cards. Finally, Apple agreed not to steer customers to alternative payment methods, like ACH.

235.    Pursuant to Visa's self-described "***mutually assured destruction principle***," Visa has continued to cooperate instead of compete with Apple because Apple has continued to honor its end of the bargain and avoid becoming a true competitor to Visa.

### 3.    Visa Prevents Real Competition from Next-Generation Innovators like Plaid.

236.    Visa has made other attempts to buy off potential competitors and protect its debit network monopoly. A prominent recent example of this type of conduct is Visa's attempted acquisition of fintech company Plaid.

237.    Plaid is a fintech firm that has access to important financial data from over 11,000 U.S. banks. This trove of financial data includes consumers' financial account information and allows companies to aggregate consumer spending data and verify balances and other personal financial information. Plaid planned to launch a service that would allow consumers to make purchases directly from their bank accounts instead of using a debit card. This new product would have competed with Visa's debit services.

238.    Plaid was uniquely positioned to overcome the significant entry barriers in the debit network market that potential entrants have faced and undermine Visa's monopoly position in this market. Plaid powers many popular and innovative consumer-facing fintech apps, including as Venmo, Acorns, and Betterment. Its technology allows fintech apps to plug into consumers' financial accounts to aggregate spending data, look up balances, and verify other personal financial information. Plaid has already built connections to well over 10,000 U.S. financial institutions and hundreds of millions of consumer bank accounts in the United States. These established connections positioned Plaid to overcome the entry barriers others have faced in attempting to provide debit services online.

239.    Plaid's existing technology did not compete directly with Visa. But Plaid planned to leverage its technology, combined with its existing relationships with financial institutions and consumers, to facilitate transactions between consumers and merchants—and thus compete with Visa. Like Visa's online debit services, Plaid's planned online debit service would enable consumers to pay for goods and services online with money debited from their bank accounts. Indeed, Plaid envisioned its new contemplated service to be "an end-to-end payments network that enable[d] instantly-guaranteed money movement" in a system "similar to Visa and Mastercard, but focused on bank-linked payments;" indeed, Plaid's planned online "pay-by-bank" debit service would compete against Visa's online debit service. DOJ Visa-Plaid Compl. ¶ 40. With this service, Plaid intended to "***steal[] share***" and become a "***formidable competitor to Visa***" in the critical online segment of the domestic debit network industry. *Id.* ¶ 8 (emphasis added). Competition from Plaid stood to drive down prices for online debit transactions and produce substantial savings to merchants and consumers in the process.

240.    Visa grew concerned about the competitive threat that Plaid and its new transaction-facilitating technology posed to its debit business. Visa executives first learned of Plaid's intentions through an initial investment that Visa made into the company in early 2019. In the ensuing weeks

and months, these Visa executives came to learn that Plaid posed a substantial risk to Visa's debit business. In September 2019, one of Plaid's co-founders contacted Visa's President to tell him that Plaid was putting itself up for sale and that the price would be around $5 billion. Visa executives believed that it had to acquire Plaid or else risk the company falling into the hands of another company that could use it to meaningfully compete against Visa in the domestic debit network market.

241. In conducting due diligence related to a potential purchase offer for Plaid, Visa set out to learn more about Plaid's efforts to launch a competing debit service that could threaten Visa's market dominance. Visa executives grew increasingly alarmed with what they discovered. In an early November 2019 meeting attended by executives from both companies, Plaid's co-founder explained how its nascent technology would allow merchants to shift transactions easily from traditional forms of online debit, which Visa dominated, to Plaid's contemplated pay-by-bank debit service. This revelation prompted one Visa executive to report internally that Plaid's co-founder had "described the service with the joy of someone who forgot we had 70% share." DOJ Visa-Plaid Compl. ¶ 44.

242. Ultimately, Visa recognized that the best course of action for its own bottom line, if nothing else, was to eliminate Plaid as a competitive threat by acquiring it and removing it from the market as an independent firm. According to contemporaneous internal company documents, one Visa executive noted:

> **The acquisition is in part defensive**, not just for Visa but also on behalf of our largest issuing [bank] clients, whom we believe have a lot to lose if [pay-by-bank transactions] accelerate as the result of **Plaid landing in the wrong hands**. **It is in our collective interest to manage the evolution of these payment forms in a way that protects the commercial results we mutually realize through card-based payments.**

DOJ Visa-Plaid Compl. ¶ 44 (emphasis added).

243. In assessing Plaid's attractiveness as a potential acquisition target in March 2019, Visa's Vice President of Corporate Development and Head of Strategic Opportunities conveyed his concerns to colleagues about the threat Plaid posed to Visa's debit business, stating that "*I don't want*

*to be IBM to their Microsoft*." DOJ Visa-Plaid Compl. ¶ 9 (emphasis added). He analogized Plaid to

an island "volcano" whose current capabilities are just "the tip showing above the water" and warned

that "[w]hat lies beneath, though, is a massive opportunity – *one that threatens Visa*." *Id.* (emphasis

added). He also illustrated Plaid's disruptive potential lurking beneath—including its "fraud tools &

reporting," "identity matching," and "payments rails and delivery"—in the following volcano sketch

he previously analogized:



*Id.*

244.    Visa's CEO concluded that Plaid was "***clearly***, on their own or owned by a competitor

***going to create some threat to our important US debit business***." DOJ Visa-Plaid Compl ¶ 10

(emphasis added). In light of this concern, he then told his CFO that buying Plaid would be "***an***

***insurance policy to protect our debit biz in the US***." *Id.* (emphasis added).

245.    In seeking board approval for the desired purchase, Visa's senior executives estimated

a "potential downside risk of $300-500M in our US debit business" by 2024 if Plaid were to be acquired

by one of Visa's debit network rivals. Visa's leadership understood such an event could create an

"***[e]xistential risk to our U.S. debit business***" and that "***Visa may be forced to accept lower margins***

***or not have a competitive offering***." DOJ Visa-Plaid Compl ¶ 1 (emphasis added).

246.    Instead of competing on the merits, Visa announced that it would do just that—even if the move did not otherwise make sense financially. On January 13, 2020, Visa announced that it would acquire Plaid for $5.3 billion, "an unprecedented revenue multiple of over 50X" and the second-largest acquisition in Visa's history. Plaid DOJ Visa-Compl. ¶ 12. Admitting that the proposed deal had "***cost dissynergies*** associated with it" and "does not hunt on financial grounds," Visa's CEO nonetheless justified the exorbitant sticker price as a "***strategic***, not financial" move because "***[o]ur US debit business i[s] critical and we must always do what it takes to protect this business***." *Id.* ¶¶ 12, 74 (emphasis added).

247.    Before Visa and Plaid could finalize the proposed transaction, however, the Department of Justice sued to block it, claiming that it violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 7 of the Clayton Act, 15 U.S.C. §18. DOJ Visa-Plaid Compl. ¶¶ 76-79.

248.    The DOJ asserted that the proposed acquisition "would eliminate the nascent competitive threat that an independently owned Plaid poses to Visa's monopoly power and unlawfully maintain Visa's monopoly power in the online debit market." DOJ Visa-Plaid Compl. ¶ 76; *see id.* ¶ 78 (alleging proposed acquisition would "eliminate nascent competition between Visa and Plaid").

249.    The DOJ explained that Visa's proposed acquisition of Plaid

> fits within an established pattern of Visa trying to thwart others from challenging its monopoly power. Specifically, Visa has a long history of protecting its monopoly in online debit by entering into contracts that forestall entry and coopt would-be rivals with lucrative partnerships. In addition to locking up many of the largest U.S. financial institutions with long-term, restrictive contracts that limit these banks' ability to issue debit cards from Visa competitors, Visa has entered into a number of 'partnerships' that benefit Visa at the expense of merchants and consumers. This conduct has prevented cheaper, more efficient online debit options from gaining traction.

DOJ Visa-Plaid Compl. ¶ 45.

250.    On January 12, 2021—little more than two months after the DOJ sued to block the acquisition—Visa and Plaid announced that they would abandon the proposed transaction.

251.    A January 12, 2021 press release that Visa and Plaid published on Visa's website announcing the acquisition's abandonment indicates that Plaid indeed has met a similar fate as Visa's other forlorn competitors. In the release, Visa Chairman and CEO Al Kelly stated that "[w]e have great respect for Plaid and the business they have built and look forward to ***our continued partnership***." Plaid CEO and Co-Founder Zach Perret added:

> We made great strides last year, growing our customers by more than sixty percent and adding hundreds of banks to our platform. While Plaid and Visa would have been a great combination, ***we have decided to instead work with Visa as an investor and partner*** so we can fully focus on building the infrastructure to support fintech.

252.    An October 28, 2021 *The Financial Brand* article corroborates the "partnership" route that Visa has taken with Plaid. "More recently, however, Plaid has taken a more conciliatory tone towards traditional financial institutions, recently telling" the publication that "the company decided that there was a bigger opportunity out there by moving from 'cooperation when needed' to full-on collaboration." The article also noted that "Plaid's head of revenue Paul Williamson told the *Wall Street Journal* that the new payments move will complement existing card networks and that its customers were looking for 'more diversified payment capability.'" The article then stated that "[a]s part of the plan, Plaid is partnering with group of 50 payment partners in North America and Europe," one of which was Square. As noted above, Visa sidelined Square as a competitive threat by coercing it into exclusionary agreements both before and after Visa attempted to acquire Plaid.

253.    Plaid has not become the serious competitor in debit that Visa once had feared because Visa once again resorted to its standard play of making this competitive threat a "partner" that it could and would control to maintain its own market dominance. In hindsight, this development makes perfect sense and constitutes additional proof for how Visa has continued to wield its monopoly power in the domestic debit network market to squash meaningful competition.

254.    As discussed above, Visa has continued its campaign of exclusionary conduct in the debit network market since it abandoned its proposed acquisition of Plaid and subsequently enlisted Plaid as one of the various "partners" in its stable.

255.    That Visa continued to engage in additional exclusionary acts pursuant to its anticompetitive scheme following the DOJ's investigation of its proposed Plaid acquisition, with the DOJ's most recent lawsuit against it as proof, demonstrates the brazenness of Visa's conduct and Visa's disregard for the nation's antitrust laws.

256.    "Now, the Plaid deal has come back to bite Visa," as the *Wall Street Journal* reported in an October 19, 2024 article. "The DOJ probe that led to last month's lawsuit started after investigators looking into the deal between Plaid and Visa began asking broader questions about Visa, according to people familiar with the matter."

## V.    ANTICOMPETITIVE EFFECTS

257.    Visa has maintained its monopoly by engaging in a systemic and continuous campaign of exclusionary and anticompetitive conduct. Visa inhibits competition for debit transactions that should be contested, and it prevents competition for currently non-contestable transactions from ever arising by imposing exclusionary and anticompetitive contracts on issuers, acquirers, merchants, potential competitors, and other industry participants.

258.    But for this web of anticompetitive contracts on both sides of the debit transaction market, PIN networks, Mastercard's Maestro, banks like JPMorgan Chase, and other back-of-card competitors could achieve the scale needed to compete with Visa's dominance and provide banks and merchants with more meaningful options for processing debit transactions.

259.    But for Visa's anticompetitive contracts with potential fintech competitors, the Big Tech and fintech companies discussed above, including Apple, PayPal, Square, and Plaid, would have the incentive to compete with Visa and bring innovative alternatives to current debit networks to

market. In turn, Visa would have the incentive to innovate, resulting in more, better choices for the processing of debit transactions.

260.    By ensuring that competitors and potential competitors cannot scale up to challenge it by using exclusionary and restrictive agreements, Visa creates an anticompetitive feedback loop that more deeply entrenches its monopoly. This anticompetitive conduct also prevents competitors from competing on price and quality, e.g. fraud protection, and it reduces the volume that competitors or potential competitors can gain from reducing price or improving the quality of their products. This disincentivizes PIN networks from lowering prices or investing in innovation. Weakening these competitors and potential competitors also makes it less likely that they can develop the features needed to contest Visa's stranglehold over non-contestable transactions, like further development of PINless routing.

261.    Visa's exclusionary and anticompetitive conduct has also suppressed innovation from Big Tech and fintech companies. For more than a decade, Visa has attempted to delay or prevent fintech companies from launching network services that could allow consumers to make payments directly from their bank accounts without the need for a middleman like Visa. Because of this conduct, Visa has likely impeded or altogether halted the introduction of products and services like staged digital wallets, store credit or discount offers on digital wallets, and other products that would improve convenience and security and facilitate improved merchant-consumer relationships. This anticompetitive conduct not only hinders innovation from these companies, but it also disincentivizes Visa from innovating. Indeed, Visa admitted that over the last decade, it has made no substantial investments in innovation other than its tokenization efforts. This is classic monopolist behavior.

262.    In a competitive market, robust competition would check Visa's supracompetitive pricing and encourage it to innovate. This would benefit consumers, merchants, issuers, acquirers, and the whole economy. But Visa has gone to great lengths to avoid robust competition. It shields its debit

transaction volume from competition whenever it can. Sometimes it does this by preventing competitors from effectively competing for market share. Other times it does this by imposing fees or offering financial payouts. This behavior reduces incentives for entities across the entire debit transaction network market—not just Visa, but also its competitors and potential competitors—to compete and innovate.

263.    A competitive market, not Visa, should determine who issuers, acquirers, merchants, and consumers decide to use for debit transactions.

264.    A competitive market, not Visa, should set the fees that market participants pay, indirectly and directly, to debit networks.

265.    A competitive market, not Visa, should determine how and how quickly Visa and its competitors create and release innovative products, processes, and technology in the market for debit transactions.

266.    But this competitive market does not exist due to Visa's exclusionary and anticompetitive conduct. Accordingly, Visa has captured a dominant volume of contestable transactions through anticompetitive means, maintained or expanded the number of non-contestable transactions, stifled threats from current and potential competitors, and, ultimately, enjoyed the unjust benefits of monopoly power.

267.    Simply put, Visa's conduct has thwarted competition from current and potential competitors, caused higher fees and worse services, and stifled innovation and progress in the national debit network market. This conduct has adversely affected virtually every participant in the United States economy—except Visa.

## VI.    LACK OF PROCOMPETITIVE BENEFITS

268.    Visa's exclusionary behavior lacks any procompetitive benefit that could outweigh the harm it inflicts on competitors, and any benefits could be realized through less restrictive alternatives.

269.    The anticompetitive clauses in Visa's exclusionary contracts and its related actions are unnecessary to protect its technology, promote customer growth, deter free-riding, or achieve any other alleged advantage.

270.    Visa could pursue any valid procompetitive goals without using the restrictive terms contested here or could achieve those benefits through less restrictive methods.

271.    In addition, Visa's coercive agreements with existing and potential direct competitors do not function as simple adjuncts to its vertical relationships. Instead, they act as anticompetitive market allocations among competitors.

## VII.    RELEVANT ANTITRUST MARKETS

272.    To identify the areas of commerce and competition that alleged anticompetitive conduct allegedly effects, courts define a relevant market, considering both the product and geographic dimensions. Many relevant markets may encompass the same or similar goods and services. These markets need not have strict boundaries.

273.    This case, and Visa's unlawful, anticompetitive conduct, implicates two relevant markets for antitrust purposes ("Relevant Markets"): (1) the market for general-purpose debit network services in the United States and (2) the market for general-purpose card-not-present debit network services in the United States. The latter market that falls within the broader market for general-purpose debit network services.

### A.    **The Relevant Geographic Market is the United States.**

274.    The United States is relevant geographic market.

275.    United States laws and regulations govern debit transactions, including card-not-present transactions. And those federal laws and regulations operate nationwide.

276.    Visa itself treats the United States as a distinct geographic market. The company structures its debit business consistent with this nationwide legal framework. It has distinct rules that

apply across the United States for merchant acceptance within the United States, and it also has separate pricing for debit payment services to merchants and other participants in the United States.

277.    Debit transactions' primary participants (consumers, issuers, acquirers, and merchants) cannot reasonably obtain debit network services outside the United States.

278.    Thus, a company that operated as the only provider of general-purpose debit network services or card-not-present network services within the United States could maintain supracompetitive prices.

**B.    The Relevant Product Markets are General-Purpose Debit Network Services and General-Purpose Card-Not-Present Debit Network Services.**

279.    This case implicates two relevant product markets: (1) general-purpose debit network services; and (2) general-purpose card-not-present debit network services.

**1.    General-Purpose Debit Network Services is a Relevant Product Market.**

280.    General-purpose debit network services facilitate direct withdrawals from a consumer's bank account, generally using a credential or account number. Visa and its debit network and fintech debit competitors offer products and services that facilitate debit transactions. They compete to provide debit network services for general purposes, which means that many unrelated merchants accept their credentials. These networks market and sell their services to issuers and acquirers or, as with some alternative networks, accountholders and merchants simultaneously. They operate two-sided platforms and act as intermediaries to facilitate transactions between merchants and accountholders. These services, collectively, are a relevant product market.

281.    Debit networks like Visa's debit network offer an array of services necessary for facilitating debit transactions that are consumed jointly by merchants, accountholders, acquirers, and issuers. These services include the ability for consumers and their banks to dispute and chargeback transactions, payment guarantees for merchants, fraud protection, and the "rail" that allows for

communication between parties and the transfer of funds from the consumer's bank to the merchant's. These key characteristics are crucial for merchants, consumers, and banks and set debit transactions apart from other payment methods. Accountholders and their banks rely on Visa and other similar debit networks to transact with merchants even though accountholders do not directly contract with Visa or its debit network competitors.

282.    Debit networks are two-sided platforms, meaning that there is a high degree of interdependence between accountholders and issuers on one side and merchants and acquirers on the other. As a debit network connects with more merchants, its value to accountholders and issuers increases. By the same token, when the debit network links to more accountholders, it provides greater benefits to merchants and acquirers.

283.    General-purpose debit network services are a relevant product market under the antitrust laws. Many consumers do not see other payment options are viable substitutes for debit. Because issuers recognize their customers' preference for debit, issuers also do not view alternative payment services as a viable replacement for debit. Because merchants do not want to lose sales by refusing to accept a widely popular payment method, they too value debit. Acquirers, who know that the merchants they serve depend on debit, also do not view alternative payment services as a viable alternative. For these reasons, there exist no reasonable substitutes for general-purpose debit network services, and one firm that dominates this market could set supracompetitive prices.

284.    The market for general-purpose debit network services includes services that both traditional debit networks and non-traditional debit networks, including fintech networks, sell. Fintech debit networks can be accepted at all merchants that participate in the network. Fintech debit networks can also provide payment guarantees, dispute resolution, and fraud protection. In fintech-processed debit transactions, consumers do not have a traditional debit card, and there are no issuers of a physical

or virtual card. Nevertheless, the services that these networks offer to consumers and merchants are the same.

285.    General-purpose credit card network services cannot be directly interchanged with debit services because debit payments are withdrawn directly from a consumer's bank account as opposed to a credit line. In Visa's terminology, debit is a "pay now" product and credit is a "pay later" product. DOJ Visa Compl. ¶ 157. The payments industry acknowledges this distinction. Visa and other networks price credit and debit transactions separately. Regulations like the Durbin Amendment, which, among other things, limits issuer fees, does not apply to credit. And many accountholders either fail to qualify for credit cards or harbor a strong preference for debit for a variety of reasons, including a desire to avoid incurring debt, which prevents issuers from substituting credit for debit.

286.    Network services for store cards and prepaid cards also cannot serve as substitutes for debit network services. Visa sees prepaid cards as complements to other card products. Holders of prepaid cards have their spending limited to the amount preloaded onto the card because the card does not connect to the cardholder's bank account. To use Visa's terminology again, prepaid is a "pay before" product, not a "pay now" product like debit. DOJ Visa Compl. ¶ 158.

287.    Basic ACH transfers, like those that The Clearing House or the Federal Reserve provide, frequently are used for specific payments (e.g., payroll, interbank settlements, recurring payments). They are not reasonably interchangeable for most debit transactions. Basic ACH transfers lack convenience. They require consumers to input bank account credentials and then verify their account for each merchant. This could take hours or days. ACH transfers also present delays and greater fraud risk for merchants. ACH transfers, unlike debit services, do not include guaranteed payment or dispute resolution. To become a viable debit alternative, newer interbank instant payment services, like the Federal Reserve's FedNow and The Clearing House's RTP, would need to add services like fraud detection, dispute resolution, and chargeback services.

288.    Cash and checks are not reasonable substitutes for debit network services. Due to differences in processing procedures and costs, merchants and accountholders do not see cash or check payments as reasonably interchangeable with debit transactions.

### 2.    General-Purpose Card-Not-Present Debit Network Services is a Relevant Product Market.

289.    General-purpose debit network services cover all debit transactions. But industry participants, including Visa, recognize narrower submarkets within this market, including the market for general-purpose card-not-present debit network services. These general-purpose card-not-present debit network services are used mainly for e-commerce transactions. The general-purpose card-not-present debit network services markets includes both traditional debit card and fintech debit transactions, both of which make it possible for consumers to pay many unrelated merchants straight from their bank account.

290.    Under the antitrust laws, the general-purpose card-not-present debit networks services market is a relevant product market. Market participants do not view other payment services as reasonable substitutes for card-not-present debit network services. The general-purpose card-not-present debit network services market has fewer viable forms of payment than the broader general-purpose debit network services market. For instance, checks are not an option. There are no reasonable substitutes for card-not-present debit.

291.    If a single firm sold general-purpose card-not-present debit network services, it could maintain supracompetitive prices.

## VIII.    VISA POSSESSES MONOPOLY POWER IN THE DOMESTIC GENERAL-PURPOSE DEBIT NETWORK MARKETS

292.    Visa has a monopoly in the markets for general-purpose debit network services and general-purpose card-not-present debit network services in the United States.

293.    Based on payment volume, Visa has market share exceeding 60% in the general-purpose debit network services market and 65% in the general-purpose card-not-present debit network services market. Mastercard, the United States' second largest (albeit much smaller) debit network, processes less than 25% of debit transactions in these markets. All other competitors have single-digit percentage shares of transactions in these markets.

294.    Visa has a monopoly in these markets because it can and has manipulated prices, restricted innovation, and suppressed competition.

295.    As demonstrated by its high profit margins, Visa has been able to maintain monopoly-level pricing. In North America, it has operating margins of 83%, and its United States debit business contributes the most to those margins. The margins that Visa has reported globally since it went public in 2007 pale in comparison to that 83% figure. Those margins also outpace most other publicly traded companies' margins.

296.    Visa has effectively blocked competition in the markets for general-purpose debit network services and general-purpose card-not-present debit network services in the United States, as shown by its ability to consistently maintain high market shares despite regulatory changes that should have reduced its dominance.

297.    Aside from a fleeting adjustment period in the immediate aftermath of the Durbin Amendment coming into effect in 2012, Visa's market share has grown over the past decade. Even though Visa's market share dropped from about 63% of debit payment volume in 2011 to 56% in 2012 right after the Durbin Amendment took effect, Visa had already taken action that would mitigate the impact of the Durbin Amendment.

298.    For instance, it had started entering agreements with merchants and acquirers to ensure that nearly all their Visa-eligible debit volume was processed on Visa's debit network. Thus, in short order, Visa recovered its prior market share and then solidified it further. Visa continued to use

similar strategies whenever it faced or faces threats to its dominance. Regulation II's recent clarification of the Durbin Amendment, which required issuers to enable at least one network unaffiliated with the front-of-card network for CNP transactions, also did not alter Visa's market share.

299.    Other factors besides Visa's high profit margins and sustained market share provide further evidence of Visa's monopoly. For example, nearly all United States merchants that process debit payments accept Visa, regardless of whether most of their revenue comes from CP or CNP transactions. The same cannot be said for smaller PIN networks. Merchants see Visa as indispensable, and they accept both networks to maximize sales opportunities, regardless of which debit cards customers use. This gives Visa significant leverage with merchants because merchants cannot just abandon Visa when faced with a price increase or unfavorable terms as they could in a competitive market.

300.    Debit networks face significant barriers to market entry and growth, like significant investment capital and resources, regulation and lack of brand recognition.

301.    Indeed, Visa itself recognizes the high entry barriers that characterize the domestic debit network market. Its own CEO has acknowledged that building an extensive debit network like Visa's is "very, very hard to do" and "takes many years of investment." DOJ Visa-Plaid Compl. ¶ 4. He further explained that entry barriers in this market are so significant that even well-funded companies with strong brand names struggle to enter let alone compete in online debit. *Id.*

302.    Merchants and acquirers are more likely to pay the costs associated with enabling and complying with debit networks that process a large volume of debit transactions. Likewise, issuers want to enable debit networks that have wide acceptance among merchants. Visa knows that its smaller rivals do not have widespread enablement by issuers or acceptance by merchants. And the markets' two-sided nature makes it hard for these smaller rivals to gain what they do not have. In other words, the markets' two-sided nature makes it hard to obtain widespread enablement without

broad acceptance by merchants, creating a feedback loop, i.e., network effects. The need for this scale creates a substantial barrier to both market entry and expansion.

303.    Generally, banks issue debit cards associated with a single front-of-card network. And, commonly, they sign long-term contracts with either Visa or Mastercard and do not switch between the two companies because doing so comes with significant costs and consumer disruption. These switching costs entrench Visa's dominance further, limit Mastercard's growth, and makes it harder for potential front-of-card competitors to enter the market or expand within it.

304.    Visa recognizes the specific barriers—including switching costs and network effects— that allow it to maintain its monopoly, and it exploits them to ward off competitors and potential competitors that could loosen its hold on the United States general-purpose debit network markets.

305.    For example, in 2023, Visa cautioned issuers that it would penalize them if they enabled new features from competing PIN networks that reduced Visa's debit network volume.

306.    When Visa issued this warning, recent Federal Reserve regulations mandated that issuers support at least two unaffiliated networks for CNP transactions. Previously, many issuers relied only on front-of-card networks (Visa or Mastercard) to process CNP transactions, but Visa worried that merchants and acquirers may, at long last, enable competitors' PINless capabilities. Given this concern, Visa started to urge issuers to disable PINless functions for CP transactions—to which the regulation did not apply—and told them that enabling CP PINless transactions may lead to higher fees and other penalties for issuers that would act as an indirect price increase for issues (one that would be difficult to avoid due to network-switching costs). By promoting the disabling of CP PINless, Visa grew the number of non-contestable transactions, which allowed it generate penalties for perceived disloyalty.

307.    Visa can set prices untethered from actual costs. It can also price discriminate across industry groups with pricing difference that have no relation to the costs of providing services.

308.    Visa's monopoly power has allowed it to introduce new, less favorable pricing models without sacrificing debit volume.

309.    In 2012, Visa unveiled its Fixed Acquirer Network Fee (FANF), which applied to all merchants and acquirers. And in October 2023, Visa implemented a Digital Commerce Service Fee that grouped many previously optional services fees into one for CNP transactions. The new mandatory fee will result in nearly five times as much revenue as compared to the previously optional fees based on Visa projections. Despite imposing these new charges, Visa knew it would not lose transactions.

## IX.    CONTINUING VIOLATION

310.    Plaintiff's claims against Visa are timely pursuant to the continuing violations doctrine.

311.    Visa's anticompetitive and unlawful conduct has continued within the applicable limitations period. The company has taken overt acts during the Class Period to maintain its monopoly, including negotiating anticompetitive volume commitment agreements that prevent merchants and acquirers from routing debit transactions away from Visa and entering into anticompetitive agreements with competitors and potential competitors during the Class Period.

312.    Visa's anticompetitive conduct throughout the Class Period and to the present has allowed it to impose higher fees on Class Members than it would have been able to in a competitive market. Accordingly, each debit transaction routed through Visa is a new overt act injuring Plaintiffs.

313.    Visa's anticompetitive conduct and its ensuing effects continue to the present.

314.    Plaintiff and the other Class members may recover damages caused by Visa's unlawful conduct during the Class Period.

## X.    CLASS ACTION ALLEGATIONS

315.    Plaintiff brings this action on behalf of itself and the following Class of all others similarly situated under Federal Rules of Civil Procedure 23(a) and 23(b)(3):

All persons, businesses, and other entities in the United States that have accepted general-purpose Visa-Branded Debit Cards from no later than October 22, 2020, to the present.

316.    For purposes of the Class definition, "Visa-Branded Debit Card" means any Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by Visa, or that is issued under any such brand or mark. "Debit Card" means any card, plate, or other payment code, device, credential, account, or service that is issued or approved for use through a payment network to debit an asset or deposit account, or that otherwise is not a Credit Card.

317.    Excluded from the Class are the following: Visa; officers, directors, or employees of Visa; any entity in which Visa has a controlling interest; any affiliate, legal representative, heir or assign of Visa; any federal, state, or local governmental entity; any judicial officer presiding over this action and members of any presiding officer's immediate family; and any juror assigned to this action.

318.    The Class is so numerous that joinder of all members in this action is impracticable. There are tens if not hundreds of thousands of geographically dispersed Class members.

319.    The Class members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, Visa's electronic transactional data and records.

320.    Plaintiff's claims are typical of those of the Class. Plaintiff and all members of the Class claim that Visa's alleged misconduct violates Section 2 of the Sherman Antitrust Act. Plaintiff and all Class members also allege and will show that they were injured by the same anticompetitive and unlawful conduct that caused them to pay Visa more for debit network service fees than they otherwise would have paid in the absence of Visa's monopolistic conduct.

321.    Plaintiff fairly and adequately will protect and represent the interests of Class members. The interests of Plaintiff and Plaintiff's counsel are fully aligned with, and not antagonistic to, the

interests of the other Class members. Plaintiffs are willing and able to dispatch the duties incumbent upon a class representative to protect the interests of all Class members.

322.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust class actions. Plaintiff's counsel possesses the necessary resources to vigorously prosecute the case to the greatest extent necessary for the Class.

323.    There are multiple questions and issues of law and fact that are common to the Class and that the Class can prove with common evidence, including the following ones:

(a)    Whether Visa monopolized the market for debit network services in the United States, including the Relevant Markets, in violation of Section 2 of the Sherman Antitrust Act;

(b)    The duration of Visa's monopoly and the acts performed by Visa in establishing, maintaining, and defending its monopoly;

(c)    The effect of Visa's misconduct on the market for debit network services in the United States, including the Relevant Markets;

(d)    Whether Visa's misconduct caused Class members to pay artificially high prices for the use of Visa's debit network services;

(e)    The proper measure of Class-wide damages; and

(f)    The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Visa's misconduct going forward.

324.    Questions of law and fact common to Class members will predominate over any individualized questions of law or fact. Visa has acted and refused to act on grounds generally applicable to the Class.

325.    Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow for the scores of Class members to prosecute their common claims, and for Visa to defend themselves against these claims, in front of a single court simultaneously and efficiently

before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## XI.    CAUSES OF ACTION

<u>**COUNT ONE**</u>
**Monopolization – Violation of Sherman Act § 2**

326.    Plaintiff incorporates and realleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

327.    Visa has monopolized the Relevant Markets in violation of Section 2 of the Sherman Act, 15 U.S.C § 2: (1) the United States market for general-purpose card-not-present debit network services, and (2) the United States market for general-purpose debit network services.

328.    Visa possesses monopoly power in the Relevant Markets.

329.    Visa has established and maintained its monopoly power in the Relevant Markets through the mutually reinforcing and interrelated courses of exclusionary and anticompetitive conduct described above.

330.    Visa's acts described above are independently and collectively anticompetitive, and they have cumulatively harmed competition in each Relevant Market.

331.    Visa's exclusionary actions, individually and collectively, have resulted in the attendant harms characteristic of a non-competitive marketplace. Visa has provided less innovative, inferior products while charging higher fees for them than it could in a competitive market.

332.    There are no procompetitive justifications for Visa's conduct. Moreover, any proffered procompetitive justifications, to the extent any exist (they do not), could have been achieved through less restrictive means.

333.    As a direct and proximate result of Visa's past and continuing violation of Section 2 of the Sherman Act, Plaintiff and the other members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying higher fees for debit card transactions than they would in the absence of Visa's anticompetitive conduct.

## COUNT TWO
### Attempted Monopolization - Violation of Sherman Act § 2

334.    Plaintiff incorporates and realleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

335.    Visa has attempted to monopolize the Relevant Markets in violation of Section 2 of the Sherman Act, 15 U.S.C § 2: (1) the United States market for general-purpose card-not-resent debit network services, and (2) the United States market for general-purpose debit network services.

336.    Visa possesses monopoly power in the Relevant Markets, or alternatively has a dangerous probability of imminently obtaining monopoly power in both Relevant Markets.

337.    Visa has attempted to establish and maintain its monopoly power in both Relevant Markets through the mutually reinforcing and interrelated courses of anticompetitive conduct described above.

338.    Visa's acts described above are independently and collectively anticompetitive, and they have cumulatively harmed competition in each Relevant Market.

339.    Visa specifically intended for its acts to individually and collectively result in the monopolization of the Relevant Markets while engaging in them. Visa intended to monopolize the Relevant Markets by thwarting meaningful competition through engaging in the conduct described

above. Unless Visa's conduct ceases, a dangerous probability exists that it will succeed, to the extent it has not already, in monopolizing each Relevant Market.

340.    There are no procompetitive justifications for Visa's conduct, and any proffered procompetitive justifications, to the extent any exist (they do not), could have been achieved through less restrictive means.

341.    As a direct and proximate result of Visa's past and continuing violation of Section 2 of the Sherman Act, Plaintiff and the other members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying higher fees for debit card transactions than they would in the absence of Visa's anticompetitive conduct.

### COUNT THREE
### Unlawful Agreements Not to Compete - Violation of Sherman Act § 1

342.    Plaintiff incorporates and realleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

343.    Visa has entered into a series of agreements with current and potential competitors not to compete in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

344.    Visa has agreed to pay certain competitors not to compete in two relevant markets: the market for general-purpose debit network services, and the market for general-purpose card-not-present debit network services.

345.    Visa has market power in both relevant markets.

346.    The agreements restrain competition by paying competitors not to compete, and by discouraging potential competitors from entering or otherwise disrupting the relevant markets, including by introducing new technologies or innovations that might threaten Visa's market position. Visa secures these agreements due to its significant power in the relevant markets and uses them to maintain its dominant position in the relevant markets.

347.    As a direct and proximate result of Visa's past and continuing violation of Section 1 of the Sherman Act, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying higher fees for debit card transactions than they would in the absence of Visa's anticompetitive conduct.

348.    There are no procompetitive justifications for Visa's conduct, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

## COUNT FOUR
### Unlawful Agreements in Restraint of Trade - Violation of Sherman Act § 1

349.    Plaintiff incorporates and realleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

350.    Visa entered into a series of agreements with merchants, issuers, and acquirers to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

351.    The agreements restrain trade in two relevant markets: the market for general-purpose debit network services, and the market for general-purpose card-not-present debit network services.

352.    Visa has market power in both relevant markets.

353.    The agreements restrain competition by entrenching Visa's dominant position in the relevant markets. In particular, Visa uses onerous penalties and restrictive volume commitments to guarantee itself a dominant share of the relevant markets. Visa secures these agreements due to its significant power in the relevant markets, and uses them to impede actual or potential competition, thereby restraining trade.

354.    As a direct and proximate result of Visa's past and continuing violation of Section 1 of the Sherman Act, Plaintiff and members of the Class have been injured in their business or property

and will continue to be injured in their business and property by paying higher fees for debit card transactions than they would in the absence of Visa's anticompetitive conduct.

355.    There are no procompetitive justifications for Visa's conduct, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

## XII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests judgment against Defendant as follows:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B.    That the Court adjudge and decree that Visa's unlawful conduct alleged herein violates the Sherman Antitrust Act;

C.    Plaintiff and the other members of the Class recover damages, to the maximum extent allowed under applicable law, and that a judgment in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled under applicable law;

D.    Defendant, its affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with it, be permanently enjoined and restrained from continuing, maintaining or renewing the conduct alleged herein, or from adopting or following any practice, plan, or program having a similar purpose or effect;

E.   Plaintiff and the other members of the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

F.   Plaintiff and the other members of the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and

G.   Plaintiff and the other members of the Class be awarded any other relief as the case may require and the Court may deem just and proper.

## XIII.   JURY TRIAL DEMAND

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

Dated:  October 22, 2024                    Respectfully submitted,

*/s/ Matthew Tripolitsiotis*

Matthew Tripolitsiotis (Attorney Bar Code MT9413)
BURNS CHAREST LLP
757 Third Ave, 20th Floor
New York, New York 10017
Tel: (469) 895-5269
mtripolitsiotis@burnscharest.com

Christopher J. Cormier (*pro hac vice* forthcoming)
Spencer Cox (*pro hac vice* forthcoming)
Matt Strauser (*pro hac vice* forthcoming)
Ian Baize (*pro hac vice* forthcoming)
BURNS CHAREST LLP
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Tel: (202) 577-3977
ccormier@burnscharest.com
scox@burnscharest.com
mstrauser@burnscharest.com
ibaize@burnscharest.com

Warren T. Burns (*pro hac vice* forthcoming)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
wburns@burnscharest.com

*Counsel for Plaintiff and the Proposed Class*